UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re HAIN CELESTIAL HEAVY METALS BABY FOOD LITIGATION,<br><br>This Document Relates To:<br>ALL ACTIONS | Case No. 2:21-CV-0678-JS-AYS |

**PLAINTIFFS EMILY BACCARI, DOMINICK GROSSI, HEATHER HYDEN, HALEY SAMS, AND VITO SCAROLA'S OPPOSITION TO
MOTIONS FOR LEADERSHIP APPOINTMENT**

**TABLE OF CONTENTS**

| | | | |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | ARGUMENT | | 2 |
| | A. | The Conglomerate Structures Are Unnecessarily Large for the Needs of the Case | 2 |
| | | 1. The Complexity of the Case Does Not Warrant Co-Lead Counsel | 3 |
| | | 2. Multi-firm Leadership Structures Likely Will Cause Unnecessary Delay | 4 |
| | | 3. An Experienced, Well-Supported Sole Lead Counsel Is Better Suited to Litigate This Action | 4 |
| | | 4. *Haynie v. Cornell University* Is Instructive | 7 |
| | B. | Best Practices Advise Against Appointing the Conglomerate Structures Under the Current Circumstances | 9 |
| | C. | Additional Factors Do Not Support the Appointment of the Conglomerate Structures | 12 |
| III. | CONCLUSION | | 13 |

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Haynie v. Cornell University*
    No. 3:20-CV-467 (MAD/ML), 2020 WL 6043947 (N.D.N.Y. Oct. 13, 2020) ...................... 7, 8

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ........................................................................................................ 9

*In re Mun. Derivatives Antitrust Litig.*,
    252 F.R.D. 184 (S.D.N.Y. 2008) ................................................................................................ 7

*Pearlman v. Cablevision Sys. Corp.*,
    No. 10-CV-4992, 2011 WL 477815 (E.D.N.Y. Feb. 1, 2011) .................................................. 7

*Youngblood v. Fam. Dollar Stores, Inc.*,
    No. 09 CIV. 3176, 2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) ................................................ 9

**STATUTES, RULES & REGULATIONS**

FEDERAL RULES OF CIVIL PROCEDURE
    Rule 23(g) ........................................................................................................... 1, 2, 7, 12
    Rule 23(g)(3) ................................................................................................................... 1

**OTHER AUTHORITIES**

BOLCH JUDICIAL INSTITUTE, DUKE LAW GUIDELINES AND BEST PRACTICES
    ADDRESSING CHRONIC FAILURE TO DIVERSIFY LEADERSHIP POSITIONS IN THE
    PRACTICE OF LAW (PART 1) (May 10, 2018) ............................................................. 5, 9, 10, 11

BOLCH JUDICIAL INSTITUTE, GUIDELINES AND BEST PRACTICES FOR LARGE AND
    MASS-TORT MDLS (2nd ed., Sept. 2018) ........................................................................... 9, 10

Hon. Stephen R. Bough & Elizabeth Chamblee Burch, *Collected Wisdom on
    Selecting Leaders and Managing MDLs*, JUDICATURE (forthcoming Fall 2021) ...................... 9

MANUAL FOR COMPLEX LITIGATION §22.1 (2004) ............................................................. 10, 12

The Baccari Plaintiffs[1] respectfully submit this opposition to the various motions for appointment of lead counsel in this action (the "Collective Motions")[2] and in further support of the Motion for Appointment of Erin Green Comite of Scott+Scott Attorneys at Law LLP ("Scott+Scott") as Interim Class Counsel and for Appointment of an Executive Committee ("Baccari Plaintiffs' Motion") (ECF No. 67) consisting of Steven L. Bloch of Silver Golub & Teitell LLP ("SGT") and Timothy J. Peter of Faruqi & Faruqi LLP ("Faruqi") ("Baccari Plaintiffs' Leadership Structure").

## I.     INTRODUCTION

The Collective Motions all have a similar problem: they each seek the appointment of an unnecessarily large, multi-firm lead counsel structure (the "Conglomerate Structures"). While this kind of structure may be appropriate in highly complex litigation of novel claims that are being litigated against multiple defendants, the litigation against Defendant Hain Celestial ("Hain") simply does not require a large or complicated leadership structure. All plaintiffs have asserted statutory and common law claims, which relate to the marketing and sale of Hain baby food

---

[1]     The "Baccari Plaintiffs" are Emily Baccari, Dominick Grossi, Heather Hyden, Haley Sams, and Vito Scarola, the named Plaintiffs in *Baccari v. Hain Celestial Group, Inc.*, No. 2:21-cv-01076-JS-AYS (E.D.N.Y.), which is consolidated in the above-captioned action. *See* ECF Nos. 15 (*Baccari*) and 47 (*In re Hain Celestial Heavy Metals Baby Food Litigation*).

[2]     The Collective Motions refer to the following eight leadership motions: (1) Memorandum of Law in Support of the Stewart Movants' Motion for Appointment of Lori G. Feldman and Rebecca A. Peterson for Interim Co-Lead Counsel (ECF No. 59-1) (the "Stewart Plaintiffs"); (2) Memorandum in Support of Motion to Appoint Melissa S. Weiner, Annick M. Persinger, and Rachel Soffin as Interim Class Counsel Pursuant to Federal Rule of Civil Procedure 23(g) (ECF No. 60-1) (the "WSP Slate"); (3) Memorandum of Law in Support of the Motion of Asyia Andrews to Appoint Labaton Sucharow as Interim Lead Counsel (ECF No. 61-1) (the "Andrews Plaintiff"); (4) Albano Plaintiffs' Notice of Motion and Motion for Appointment of Cohen Milstein Sellers & Toll PLLC and Gibbs Law Group LLP as Interim Counsel (ECF No. 62) (the "Albano Plaintiffs"); (5) Motion of Kohn, Swift & Graf, P.C. for Appointment as Interim Lead Counsel in the Hain Celestial Heavy Metals Baby Food Litigation and Memorandum in Support (ECF No. 63) (the "Lawrence Plaintiffs"); (6) Motion to Appoint Gary F. Lynch and Jeffrey K. Brown as Interim Co-Lead Counsel and Judge John G. Marks (Ret.) as Liaison Counsel (ECF No. 64-1) (the "Gray Plaintiffs"); (7) The Bredberg Plaintiffs' Motion for Appointment of Wolf Haldenstein Adler Freeman & Herz LLP to the Plaintiffs' Steering Committee and Memorandum in Support (ECF No. 65) (the "Bredberg Plaintiffs"); and (8) Memorandum of Law in Support of the Mays Plaintiffs' Motion for Appointment of Interim Lead Counsel, Interim Liaison Counsel, and Executive Committee Pursuant to Fed. R. Civ. P. 23(g)(3) (ECF No. 66-1) (the "Mays Plaintiffs"). Unless specifically indicated otherwise, the arguments made throughout this opposition are applicable to all of the Collective Motions.

1

products. Although the action will require expert analysis and review of the composition of Hain's baby food products, the work necessary to prosecute this case can be done by a few law firms that possess the experience and resources necessary to obtain the best possible outcome for the class. Thus, a smaller and diverse plaintiffs' counsel structure, as proposed here, would be more efficient. This, in turn, will reduce duplication of work and result in real cost savings for the class. Moreover, under the current circumstances appointing the Baccari Plaintiffs' Leadership Structure as lead instead of the Conglomerate Structures comports with Rule 23(g), the MANUAL ON COMPLEX LITIGATION, and other best practices for leadership appointments.

For the reasons discussed below, the Baccari Plaintiffs respectfully request that the Court deny the leadership applications of the Collective Motions and instead grant the Baccari Plaintiffs' Motion.

## II.     ARGUMENT

### A.     The Conglomerate Structures Are Unnecessarily Large for the Needs of the Case

The Collective Motions each propose various slates of multi-firm counsel structures for appointment of lead counsel in this action. For example, the Stewart Plaintiffs seek the appointment of two attorneys as co-lead counsel and a three-firm executive committee. ECF No. 59-1. The Albano Plaintiffs also seek the appointment of two attorneys as co-lead counsel and support the appointment of a four-firm executive committee. ECF No. 62. The Mays Plaintiffs seek the appointment of two attorneys as co-lead counsel and a five-firm executive committee. ECF No. 66-1. The WPS Slate seeks the appointment of three attorneys as co-lead counsel. ECF No. 60-1. Each one of these multi-firm counsel structures touts their collective ability to best advocate the interests of the class. While there is no doubt that each firm has experience in litigating complex class actions, some involving consumer products, these lead counsel structures

2

all suffer from a uniform flaw: too many firms appointed to positions for what is needed to litigate this case. Indeed, this flaw becomes even more apparent when the multi-firm counsel structures proposed in the Collective Motions are compared to the equally qualified Ms. Comite, whom Plaintiffs have moved to be appointed at the *sole* lead counsel and the resources of Scott+Scott, with over 100 attorneys located throughout the United State and in Europe. With the additional support and counsel of Messrs. Bloch and Peter and their respective firms as the Executive Committee, Plaintiffs' Leadership Structure is more than capable of vigorously litigating this action under the current circumstances.

### 1. The Complexity of the Case Does Not Warrant Co-Lead Counsel

To begin, this is a straightforward action that does not involve any particularly novel or esoteric legal claims. In fact, this entire action stems from a report from the United States House of Representatives Committee on Oversight and Reform's Subcommittee on Economic and Consumer Policy entitled "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" that was released on February 4, 2021 (the "Subcommittee Report"). As the title clearly indicates, the legal claims based on the Subcommittee Report all center on the revelation that several brands of baby food sold in the United States (including Hain's products) contain unsafe levels of heavy metals and other toxins. Cases like this involving contaminated foods and products containing dangerously high levels of heavy metals occupy a well-developed area of consumer protection law. Additionally, unlike larger cases with multiple defendants that each have unique defenses, here there is only one defendant that lead counsel must engage with and litigate against. In short, the complexity of claims and single adversary in this action do not warrant a multi-firm lead counsel structure.

### 2. Multi-firm Leadership Structures Likely Will Cause Unnecessary Delay

Not only is a multi-firm lead counsel structure not necessary for this action, but also it may be detrimental to the efficient prosecution of the claims alleged. Decision-making by committee creates the increased potential for unbreakable deadlocks between firms who have different opinions on litigation strategy decisions. Several of the proposed leadership structures are susceptible to this. Even putting aside the potential for a voting deadlock, the need to have multiple firms review and sign off on each submission or letter undeniably delays the process as a whole. *See infra* Section II.B. Increased delays from inefficient multi-firm leadership structures should be particularly hard to accept given the streamlined nature of engaging with the single defendant.

### 3. An Experienced, Well-Supported Sole Lead Counsel Is Better Suited to Litigate This Action

In contrast, the Baccari Plaintiffs propose a structure with a single lead counsel, Ms. Comite. As her background demonstrates, Ms. Comite brings a distinct set of skills and experiences that are specifically useful in prosecuting the claims alleged. Most notably, Ms. Comite's prior leadership experience, including her experience as part of the leadership structure in *In re Herbal Supplements Marketing and Sales Practices Litigation*, MDL No. 2519 (N.D. Ill.), will necessarily benefit this litigation given that the *Herbal Supplements* litigation involved claims regarding the ingredients and potential contaminants contained within certain supplements, and included extensive discovery, testing, and expert analyses of the products. Thus, Ms. Comite's prior leadership experience in *Herbal Supplements* renders her uniquely suited to litigate these claims against Hain, which too will involve extensive discovery, testing, and expert analyses of Hain's baby food products for the presence of toxic heavy metals. Moreover, as previously stated, Ms. Comite has successfully prosecuted numerous consumer class actions related to food products (*see* Motion to Appoint Erin Green Comite as Interim Lead Counsel and for Appointment of an

4

Executive Committee (the "Baccari Plaintiffs' Motion"), ECF No. 67, at 4-5), and her experience in successfully prosecuting cases with data-intensive discovery will be particularly helpful for litigating this case. *See, e.g.*, *First Choice Federal Credit Union v. The Wendy's Co.*, No. 16-cv-00506 (W.D. Pa.) (co-lead; $50 million settlement). And while Ms. Comite's firm, Scott+Scott, is but one law firm, it is more than capable on its own of leading this case to a successful resolution that benefits the class. Scott+Scott has more than 100 attorneys throughout offices in New York, Connecticut, California, Ohio, and Virginia, as well as abroad in London, Amsterdam, and Germany. Complementing its litigators are the firm's in-house investigation department and e-discovery litigation support team. As further evidence of the lack of Scott+Scott's need to outsource work on the case, the firm has numerous bi-lingual attorneys that are able to speak and translate the following commonly-spoken languages, *inter alia*, when necessary: Spanish, Chinese (Cantonese and Mandarin), French, Italian, German, and Russian.[3] This can allow the Baccari Plaintiffs' Leadership Structure to engage with potential class members in the language that is most comfortable for them and best represent the diverse nature of the class.

Relatedly, Scott+Scott's commitment to diversity does not end with the identity of those attorneys set to staff this action or with simply "look[ing] good on paper."[4] Far from merely promoting diversity quotas or "box-ticking,"[5] Scott+Scott has had a long-standing commitment to equity and diversity in the workplace. As previously stated, Law360's Glass Ceiling Report recognized Scott+Scott as a "Ceiling Smasher" and a firm that has one of the highest

---

[3] Scott+Scott also has Albanian, Tagalog, Vietnamese, and Dutch speaking attorneys that can similarly serve as in-house translators.

[4] *See* Bolch Judicial Institute, Duke Law Guidelines and Best Practices Addressing Chronic Failure to Diversify Leadership Positions in the Practice of Law (Part 1) (May 10, 2018).

[5] *Id*.

concentrations of female attorneys and female equity partners for firms of its size. Baccari Plaintiffs' Motion (ECF No. 67) at 12.

In addition to Scott+Scott's commitment to work-place equity, Scott+Scott has been at the forefront in litigation representing consumer's rights. Scott+Scott represented the Vulcan Society, the fraternal organization of black firefighters, as well as three FDNY minority applicants against the City of New York alleging the Fire Department of the City of New York had engaged in certain practices which had a disparate impact upon Black and Latino applicants in violation of Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and New York City Administrative Code. *United States of America and The Vulcan Society v. The City of New York*, 07-cv-2076 (S.D.N.Y). In 2014, a $98 million dollar settlement was reached on behalf of Black and Latino candidates. In addition, Ms. Comite and Scott+Scott represented workers of United Parcel Service ("UPS") nationwide, alleging that UPS violated the Americans with Disabilities Act. *See Hohider v. United Postal Service, Inc*., No. 07-4588 (W.D. Pa). Concurrently, as part of the firm's focus on linking diversity initiatives with *pro bono* programs, Scott+Scott continues to strengthen its unique collaboration with local bar association activities. Through its work with the Center for Women & Enterprise, Scott+Scott has helped female entrepreneurs obtain formal certification for woman-owned businesses and gain access to public funding and corporate markets. In short, Scott+Scott has a host of attorneys with diverse backgrounds, related experience, and a history of successfully representing clients of all types. These vast resources will be brought to bear with the Baccari Plaintiffs' Leadership Structure.

In addition to the significant backing of her own firm, Ms. Comite will be supported by equally capable Executive Committee members Steven L. Bloch of SGT and Timothy J. Peter of Faruqi. The proposed Executive Committee members are accomplished litigators in their own

6

rights with the full support of their respective firms. Thus, Messrs. Bloch and Peter can provide both wise counsel and significant resources to aid Ms. Comite's efforts as lead counsel. As discussed in the Baccari Plaintiffs' Motion (*see* ECF No. 67 at 7-10), both SGT and Faruqi have the financial wherewithal to shoulder the costs of hard-fought litigation and a long track record of achieving serious recoveries for their respective clients. For example, SGT's advocacy and counsel has resulted in literal billions of dollars on behalf of class members. As another example of the depth of resources that the Baccari Plaintiffs' Leadership Structure can deploy in this action, Faruqi itself has 30 lawyers across five states nationwide. These "greater collective resources" are a factor that also weighs in favor of the appointment of the Baccari Plaintiffs' Leadership Structure over the other Conglomerate Structures with less ability to fund and staff the case. *In re Mun. Derivatives Antitrust Litig.*, 252 F.R.D. 184, 186–87 (S.D.N.Y. 2008).

As this Court concluded in a decision on another set of pending motions for appointment of lead counsel, when the facts bearing on the other Rule 23(g) factors are "roughly comparable," appointment of the law firm with a deeper bench is appropriate because "greater depth suggests that it is better suited to safeguarding the putative class's interests." *Pearlman v. Cablevision Sys. Corp.*, No. 10-CV-4992 (JS), 2011 WL 477815, at *2 (E.D.N.Y. Feb. 1, 2011) (Seybert, J.). Here, while moving counsel are equally capable of zealous advocacy on behalf of the class, the Baccari Plaintiffs' Leadership Structure is superior to the proposed multi-firm counsel structures in the Collective Motions since it can achieve that same zealous advocacy but with a lean, effective leadership structure.

    **4.**    *Haynie v. Cornell University* **Is Instructive**

The case of *Haynie v. Cornell University* involves analogous factual circumstances and is particularly instructive on how to deal with the kinds of completing slates of proposed leadership structures in this action. *See* No. 3:20-CV-467 (MAD/ML), 2020 WL 6043947 (N.D.N.Y. Oct.

7

13, 2020). In short, when presented with a similarly large, proposed counsel structure, the court rejected it as "unnecessarily duplicative." *Id*., at *2. Seizing on the key issue, Judge D'Agostino noted the following:

> Appointing three law firms as co-lead interim counsel and another law firm as local counsel does not encourage judicial economy and efficiency. . . . [While the] Court has no doubt that each of the firms proposed are more than capable of adequately representing the interests of the putative class prior to class certification. The only question remaining is whether appointing all three firms as co-lead counsel is necessary and justified in this case."

*Id.* Ultimately, the court answered that question in the negative. Among other things, it was "not a situation in which each law firm brings a complementary skill set to the litigation. . . . Nor [was it] a situation involving many consolidated actions and an excessive number of parties." *Id.,* at *3.[6] Further, the *Haynie* plaintiffs brought claims against a single defendant, which were based on legal theories "not so complex as to warrant a multi-firm counsel structure." *Id*. Accordingly, the court found that "appointment of a single lead counsel best serves the interests of judicial economy while protecting the interests of the putative class." *Id.*

These persuasive factual circumstances track closely with those in this action. Most of the Conglomerate Structures in the Competing Motions involve several different law firms serving as co-leads. When coupled with unwieldy slates of additional liaison counsel and/or steering committee members, such multi-law firm co-lead structures should not alleviate any "concerns regarding duplicative work and unnecessary delays." *Id*., at *2. Moreover, like *Haynie*, this action does not involve an "excessive" number of parties but rather a lone defendant. And the legal claims being brought here come in the wake of a thorough and detailed government investigation,

---

[6] Unless otherwise noted, citations are omitted and emphasis is added.

8

and they cover familiar consumer protection claims—hardly so "unprecedented" or complex as to necessitate the kinds of multi-firm counsel structures put forth in the Competing Motions. *See id*., at *3.

*   *   *

In conclusion, appointment of Ms. Comite as sole lead counsel, with the support of a small Executive Committee, strikes the appropriate balance of needing experienced plaintiffs' counsel that have the ability to appropriately fund and staff a case against top-tier defense counsel, while also keeping the case efficient and cost-effective. Under the circumstances in this action, appointment of more than one lead counsel is simply not needed to prosecute the claims alleged. *See Youngblood v. Fam. Dollar Stores, Inc*., No. 09 CIV. 3176 (RMB), 2011 WL 4597555, at *6 (S.D.N.Y. Oct. 4, 2011) ("There does not, in the Court's view, appear to be any need for more than one lead counsel."); *see also In re Merck & Co., Inc. Sec. Litig*., 432 F.3d 261, 267 n. 4 (3d Cir. 2005) ("If plaintiffs believe that more than one law firm is necessary, they must demonstrate to the Court's satisfaction the need for multiple lead counsel.").[7] Put simply, Ms. Comite and the two-firm Executive Committee can do what the Collective Motions contend will take an army of lawyers and law firms to accomplish.

### B. Best Practices Advise Against Appointing the Conglomerate Structures Under the Current Circumstances

In 2018, Duke Law School published its GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS (the "Duke Guidelines"),[8] which provided courts with both a set of guidelines

---

[7] Hon. Stephen R. Bough & Elizabeth Chamblee Burch, *Collected Wisdom on Selecting Leaders and Managing MDLs*, JUDICATURE (forthcoming Fall 2021) (observing that duplicative work by co-leads should "not be tolerated and attorneys wishing to share in the common-benefit fee must prove their added value"), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3826679.

[8] *See* BOLCH JUDICIAL INSTITUTE, GUIDELINES AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS (2nd ed., Sept. 2018), *available at* https://judicialstudies.duke.edu/wp-content/uploads/2018/09/MDL-2nd-Edition-2018-For-Posting.pdf.

9

for MDL litigation and the best practices for, *inter alia*, the "Selection and Appointment of Leadership." Duke Guidelines at 29. The multi-firm lead counsel structures proposed in the Collective Motions fail to abide by these guidelines and best practices.

At the outset, when initially establishing a leadership structure for plaintiffs that promotes "effective management of the litigation," the Duke Guidelines advise that the first thing the court should do is "assess the needs of the litigation in establishing an appropriate leadership structure." *Id*. at 29 (Guideline 2 and Best Practice 2A). Factors that contribute to this assessment include: "the nature of the claims, the number of cases, and the variety and complexity of interests involved." Duke Guidelines at 30 (Best Practice 2B). In fact, the type of case is "***often the most important consideration***" in determining the appropriate leadership structure. *Id*. (emphasis added). As discussed above (*see supra* Section II.A), this action is straightforward and involves a single defendant. Indeed, this action is precisely the "type" of case that the Duke Guidelines is referring to when it states: "Sometimes a fairly simple structure . . . is all that is required." *Id*. Moreover, as the Duke Guidelines observed, consumer class actions like this case "often fall into this category." *Id*.

The multi-firm leadership structures proposed in the Collective Motions and the inherent delays associated with trying to make decisions with an excessive number of lawyers are also cautioned against in the Duke Guidelines: "The greatest challenge is often to ensure that decisions can be made without delay caused by the need to consult numerous people, while still giving all interested members of the litigation team the opportunity to provide input." *Id*. at 31. The Duke Guidelines further emphasized that the number of law firms appointed as lead counsel "should not be so large that it defeats the purpose of appointing someone to lead the litigation." *Id*. Instead, the best practice advises that "[a]ppointing a committee to support lead counsel is usually more

10

effective than staffing the litigation with numerous co-lead counsel, which can lead to delays in decision making and unnecessary duplication of effort." *Id*. at 32.

Moreover, courts making a leadership determination are also cautioned that a proposed leadership group with legions of lawyers "may include members who are not fully committed to the litigation but are included because their resumes make the group's application more appealing."[9] This is one of the reasons the MANUAL FOR COMPLEX LITIGATION "urges courts not to rubber stamp a leadership slate proposed by a majority of attorneys in the case."[10]

The Baccari Plaintiffs' Leadership Structure of a sole interim lead counsel and a two-firm Executive Committee comports with the Duke Guidelines and suggested best practices for leadership appointment, while the Conglomerate Structures do not.  Appointment of a sole lead counsel will ensure that there are no split-decisions or ties when it comes to making key decisions in the case.  Ms. Comite, in consultation with Messrs. Bloch and Peter, will be able to act decisively without delay and delegate tasks as appropriate.  This streamlined leadership dynamic will benefit the class in both efficiencies and cost savings.  Moreover, Ms. Comite will be an active, hands-on leader with direct involvement in the day-to-day prosecution of the action.  As a testament to her experience and skills, the Gray Plaintiffs have supported Ms. Comite's appointment to a leadership position. *See* Gray Plaintiffs' Motion (ECF No. 64-1) at 1 fn. 1.[11]  Ms. Comite and the Baccari Plaintiffs' Leadership Structure have also received the support of Haeggquist and Eck, who is filing a response in opposition to the Collective Motions.

---

[9]     *See* Duke Law Guidelines.

[10]    Manual for Complex Litigation §22.1 (2004).

[11]    To the extent the Court believes a co-lead counsel structure would be more appropriate, the Baccari Plaintiffs would support the Gray Plaintiffs' counsel Gary Lynch as co-lead counsel along with Ms. Comite.

11

### C. Additional Factors Do Not Support the Appointment of the Conglomerate Structures

While the composition of the Conglomerate Structures alone warrants a denial of leadership appointment under the present circumstances, there are two specific factors raised by some of the Collective Motions that should be given little to no weight: (1) the sequence of filing; and (2) claiming standard tasks as "work done" under Rule 23(g).

First, as noted above, this litigation only arose *after* the U.S. House Subcommittee issued its report on finding the presence of heavy metals and other toxins in various baby food products. No firm can claim that the work done is far superior to any other firm or warrants appointment as lead counsel. No case was filed prior to the Subcommittee Report, demonstrating that any arguments about the sequence of filing in this action hold little (if any) weight.

Second, several of the Collective Motions point to basic tasks of case administration and litigating a case to argue that their respective firms have done more work to benefit the class and should, thus, be appointed as lead counsel. But this is nothing beyond what normally occurs throughout the course of litigation, not to mention being premature at this phase. For example, the drafting of discovery requests is hardly unique. More importantly, at this early stage the movants simply do not know what claims will survive a motion to dismiss. Most likely, these so-called draft discovery requests will be completely rewritten before they are ever actually served on Hain. This is precisely the kind of duplicative work that is shunned by both the Duke Guidelines and the MANUAL FOR COMPLEX LITIGATION.

Moreover, proposals to create a time and expense protocol are common in all complex litigation, and thus, are not dispositive as to whether a firm should be appointed lead counsel. The Baccari Plaintiffs' Leadership Structure, once appointed, will implement a time and expenses management protocol and will submit periodic reports to the Court, *in camera,* with Plaintiffs'

counsel's time and expenses incurred in the litigation. Drawing off their prior experience as lead counsel in other MDLs, along with their desire to litigate this action in the most efficient and cost-effective manner, the Baccari Plaintiffs' Leadership Structure will review and audit time submitted by any firm. Using these procedures, the Baccari Plaintiffs' Leadership Structure will review the submissions of each firm to ensure that no work is duplicative and that the work designated to specific firms is performed timely and efficiently.

### III. CONCLUSION

For all the reason stated above, this Court should deny each of the Collective Motions and order the appointment of Erin Green Comite as Interim Class Counsel, along with Steven L. Bloch and Timothy J. Peter as Executive Committee members.

Dated: June 10, 2021                                    Respectfully submitted,

 /s/ Erin Green Comite
Erin Green Comite
Joseph P. Guglielmo
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 223-4478
Fax: (212) 233-6334
ecomite@scott-scott.com
jguglielmo@scott-scott.com

Steven L. Bloch
Ian W. Sloss
Zachary Rynar
**SILVER GOLUB & TEITELL LLP**
184 Atlantic Street
Stamford, Connecticut 06901
Tel.: (203) 325-4491
Fax: (203) 325-3769
sbloch@sgtlaw.com
isloss@sgtlaw.com
zrynar@sgtlaw.com

Timothy J. Peter

13

        **FARUQI & FARUQI, LLP**
        1617 JFK Boulevard, Suite 1550
        Philadelphia, PA 19103
        Tel.: (267) 536-2145
        Fax: (215) 277-5771

        *Attorneys for Plaintiffs Emily Baccari, Dominick Grossi, Heather Hyden, Haley Sams, and Vito Scarola*

## CERTIFICATE OF SERVICE

      I, Erin Green Comite, hereby certify that the foregoing document was filed electronically through the Court's Electronic Case Filing System. Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.

                                             /s/ *Erin Green Comite*
                                               Erin Green Comite