# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AILEEN GARCES, EDELIN ALTUVE, BRANDY DANIELS, DIEGO GALEANA, APRIL GILLENS, ELIZABETH HALL, SAVANNA JARRELL, LASZLO KOVACS, CORI LAU, MICHELLE LYLES, CHRISTINA MARTINSON, STACY MUSTO, CHRIS NALLEY, GLADYS OKOLO, LIDIA TILAHUN, and DAMEN WALTON, individually, and on behalf of all others similarly situated, | **Case No.:** <br><br> **Jury Trial Demanded** |
| Plaintiffs, |  |
| v. |  |
| THE HAIN CELESTIAL GROUP, INC., |  |
| Defendant. |  |

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

PARTIES ..............................................................................................................................2

JURISDICTION AND VENUE ...........................................................................................3

FACTUAL ALLEGATIONS ...............................................................................................4

    The Subcommittee Report ................................................................................................4

    Arsenic in Defendant's Baby Food .................................................................................5

    Lead in Defendant's Baby Food ......................................................................................7

    Cadmium in Defendant's Baby Food ..............................................................................8

    Defendant's Internal Testing ...........................................................................................9

    Defendant's Baby Food ................................................................................................10

    Consumer Expectations Regarding Baby Food.............................................................12

    Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food ..................15

    Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food ................15

    Plaintiff Diego Galeana Purchased Defendant's Contaminated Baby Food .................15

    Plaintiff Aileen Garces Purchased Defendant's Contaminated Baby Food ..................16

    Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food.....................16

    Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food...................17

    Plaintiff Savanna Jarrell Purchased Defendant's Contaminated Baby Food ................17

    Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food ..................17

    Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food ...................18

    Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food..................18

    Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food.................18

Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food.............................19

Plaintiff Chris Nalley Purchased Defendant's Contaminated Baby Food ...........................19

Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food .........................19

Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food...........................20

Plaintiff Damen Walton Purchased Defendant's Contaminated Baby Food ........................20

Facts Relating to All Plaintiffs and Class Members................................................20

CLASS ALLEGATIONS ...............................................................................23

COUNT 1 (On Behalf of Plaintiff Tilahun and the California Subclass) Violation of California Business & Professions Code §§ 17200, *et seq.* for Engaging in Unlawful, Unfair, and Deceptive Business Acts or Practices.......................................................28

COUNT 2 (On Behalf of Plaintiff Tilahun and the California Subclass) Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq* ...................................31

COUNT 3 (On Behalf of Plaintiff Altuve the Florida Subclass) Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") Fla. Stat. § 501.201, *et seq* .................33

COUNT 4 (On Behalf of Plaintiff Martinson and the Georgia Subclass) Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") O.C.G.A. §§ 10-1-370, *et seq* ...............36

COUNT 5 (On Behalf of Plaintiff Martinson and the Georgia Subclass Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.* .....................38

COUNT 6 (On Behalf of Plaintiffs Garces, Galeana, and the Illinois Subclass) Violation of the Illinois Consumer Fraud and  Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.................................................................................40

COUNT 7 (On Behalf of Plaintiff Walton and the Iowa Subclass) Violation of the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.* ("IPRACFA") .........................................................................................43

COUNT 8 (On Behalf of Plaintiff Jarrell and the Kentucky Subclass) Violation of Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110, *et seq.* ........................................46

COUNT 9 (On Behalf of Plaintiff Lyles and the Maryland Subclass) Violation of the Maryland Consumer Protection Act, Md. Code, Comm. Law §§ 13-301, *et seq.* ("MCPA") ......48

COUNT 10 (On Behalf of Plaintiffs Musto, Nalley, and the Missouri Subclass) Violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Stat. § 407.010, *et seq*...................51

COUNT 11 (On Behalf of Plaintiff Lau and the Nevada Subclass) Violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0915 ("NDTPA")......................53

COUNT 12 (On Behalf of Plaintiff Hall and the New Hampshire Subclass) Violation of New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. §§ 358-A:1, *et seq* ................................................................................................................56

COUNT 13 (On Behalf of Plaintiff Daniels and the North Carolina Subclass) Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("NCUDTPA") ..............................................................................................................58

COUNT 14 (On Behalf of Plaintiff Altuve and the North Dakota Subclass) Violation of the North Dakota Unlawful Sales or Advertising Practices, N.D.C.C. § 51-15, *et seq.* .....................60

COUNT 15 (On Behalf of Plaintiff Kovacs and the Tennessee Subclass) Violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Stat. § 47-18-101, *et seq.* ......................63

COUNT 16 (On Behalf of Plaintiff Okolo and the Virginia Subclass) Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"),Va. Code § 59.1-196, *et seq.* .................................66

COUNT 17 (On Behalf of Plaintiff Gillens and the Washington D.C. Subclass) Violation of Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* ("CPPA") ..........................68

COUNT 18 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Fraudulent Concealment ..............................................................................................................71

COUNT 19 (On Behalf of All Plaintiffs and the Class and Each State Subclass) Unjust Enrichment ....................................................................................................................72

PRAYER FOR RELIEF ..............................................................................................................74

Plaintiffs AILEEN GARCES, EDELIN ALTUVE, BRANDY DANIELS, DIEGO GALEANA, APRIL GILLENS, ELIZABETH HALL, SAVANNA JARRELL, LASZLO KOVACS, CORI LAU, MICHELLE LYLES, CHRISTINA MARTINSON, STACY MUSTO, CHRIS NALLEY, GLADYS OKOLO, LIDIA TILAHUN, and DAMEN WALTON, ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel at Dann Law and Zimmerman Law Offices, P.C., bring this Class Action Complaint against Defendant THE HAIN CELESTIAL GROUP, INC. ("Defendant"), as follows:

## **INTRODUCTION**

1.        On February 4, 2021, the United States House of Representatives Committee on Oversight and Reform's Subcommittee on Economic and Consumer Policy (the "House Subcommittee") released a report entitled "Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury" (the "Subcommittee Report"). *See generally*, Subcommittee Report, attached hereto as Exhibit 1. According to the Subcommittee Report, which cites test results provided by baby food companies to the Committee, several brands of baby food sold in the United States contain unsafe levels of toxic heavy metals, including those sold by Defendant. *See*, Subcommittee Report, p. 2.

2.        Given the health risks associated with high levels of toxic heavy metals, the mere presence of these substances in baby food is a material fact to consumers. To an even greater extent, the unreasonably high levels of toxic heavy metals found in Defendant's baby food products sell is material. Consumers—such as Plaintiffs and members of the Classes (defined below)—are unwilling to purchase baby food that contains unsafe levels of toxic heavy metals.

3.        Defendant knew about the presence and levels of toxic heavy metals in its baby food. Defendant also knew about the health effects of exposure to toxic heavy metals and the

1

impact they have on developing children and babies. Defendant omitted and concealed these material facts from Plaintiffs and Class members. Defendant furthered their unfair and deceptive course of conduct by making representations about the wholesomeness and health benefits of their baby food.

4.     Accordingly, Plaintiffs bring this suit on behalf of themselves and Classes of similarly situated individuals for out-of-pocket losses, compensation, and all other relief to which they are lawfully entitled, resulting from Defendant's sale of baby food that contained unsafe levels of toxic heavy metals.

**PARTIES**

5.     Plaintiff AILEEN GARCES ("Garces") is a natural person, and resident and citizen of Illinois.

6.     Plaintiff EDELIN ALTUVE ("Altuve") is a natural person, and resident and citizen of North Dakota.

7.     Plaintiff BRANDY DANIELS ("Daniels") is a natural person, and resident and citizen of North Carolina.

8.     Plaintiff DIEGO GALEANA ("Galeana") is a natural person, and resident and citizen of Illinois.

9.     Plaintiff APRIL GILLENS ("Gillens") is a natural person, and resident and citizen of Washington, D.C.

10.     Plaintiff ELIZABETH HALL ("Hall") is a natural person, and resident and citizen of New Hampshire.

11.     Plaintiff SAVANNA JARRELL ("Jarrell") is a natural person, and resident and citizen of Kentucky.

2

12.     Plaintiff LASZLO KOVACS ("Kovacs") is a natural person, and resident and citizen of Tennessee.

13.     Plaintiff CORI LAU ("Lau") is a natural person, and resident and citizen of Nevada.

14.     Plaintiff MICHELLE LYLES ("Lyles") is a natural person, and resident and citizen of Maryland.

15.     Plaintiff CHRISTINA MARTINSON ("Martinson") is a natural person, and resident and citizen of Georgia.

16.     Plaintiff STACY MUSTO ("Musto") is a natural person, and resident and citizen of Missouri.

17.     Plaintiff CHRIS NALLEY ("Nalley") is a natural person, and resident and citizen of Missouri.

18.     Plaintiff GLADYS OKOLO ("Okolo") is a natural person, and resident and citizen of Virginia.

19.     Plaintiff LIDIA TILAHUN ("Tilahun") is a natural person, and resident and citizen of California.

20.     Plaintiff DAMEN WALTON ("Walton") is a natural person, and resident and citizen of Iowa.

21.     Defendant THE HAIN CELESTIAL GROUP, INC. is a Delaware corporation with its principal place of business in Lake Success, New York in Nassau County.  Hain sells its baby food under the "Earth's Best Organic" brand name ("Earth's Best Brand Baby Food"). Earth's Best Brand Baby Food is sold nationwide, including throughout the state of New York.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1332(d). As set forth below, the proposed Classes each include more than 100 individuals, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000 exclusive of interest and costs, given Defendant's market reach and the approximate number of putative Class members in the United States. Some members of the proposed Classes are citizens of states different from Defendant.

23.     Venue is proper in this district under 28 U.S.C. § 1391, because Defendant has its headquarters in this district, and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

### *The Subcommittee Report*

24.     Inorganic arsenic, lead, cadmium, and mercury are toxic heavy metals (the "Toxic Heavy Metals"). The United States Food and Drug Administration ("FDA") and the World Health Organization ("WHO") have declared these Toxic Heavy Metals dangerous to human health. Specifically, FDA states that these Toxic Heavy Metals have "no established health benefit," "lead to illness, impairment, and in high doses, death," and because of bioaccumulation, "even low levels of harmful metals from individual food sources, can sometimes add up to a level of concern."[1]

25.     The dangerous effects of these toxins are exacerbated and can be indelible in developing and vulnerable bodies and brains of babies and children, who FDA explains are at the greatest risk of harm. *See* Subcommittee Report, p. 2. Exposure, such as ingestion, of Toxic Heavy Metals by babies and children leads to untreatable and permanent brain damage, resulting in reduced intelligence and behavioral problems. For instance, scientific studies have connected

---

[1] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.

exposure to lead to a substantial decrease in children's total IQ points and their lifetime earning capacity. *See* Subcommittee Report, p. 9.

26.     "Exposure to toxic heavy metals [such as arsenic, lead, cadmium, and mercury] causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children. Toxic heavy metals endanger infant neurological development and long-term brain function." *See*, Subcommittee Report, p. 2.

27.     Because Toxic Heavy Metals have no benefits and severe detriments, Healthy Babies Bright Futures, an alliance of nonprofit organizations, scientists, and donors whose work is cited favorably in the Subcommittee Report, has concluded that baby food should have no measurable amount of arsenic, lead, cadmium, or mercury. [2]

28.     Given the risks, and in response to reports alleging high levels of Toxic Heavy Metals in baby food sold in the United States, the House Subcommittee launched an investigation into the presence of Toxic Heavy Metals in certain brands of baby food, including Defendant's baby food.   *See*, Subcommittee Report, p. 2.   The results of the House Subcommittee's investigation were set forth in the Subcommittee Report, which was released on February 4, 2021.

### *Arsenic in Defendant's Baby Food*

29.     According to the Subcommittee Report, arsenic was present in all brands of baby food responding to the House Subcommittee's investigation. In particular, Earth's Best Brand Baby Food was found to contain as much as 129 parts per billion—abbreviated as "ppb"—arsenic, and was made with ingredients that contained as high as 309 ppb arsenic. *See*, Subcommittee Report, p. 3.

---

[2] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019), at 12 (online www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

30.     The levels of toxic arsenic in Defendant's baby food far exceeded the 10 ppb limit the FDA has set for arsenic in bottled water that is legal to sell to any consumer, even full grown adults.  *See*, Subcommittee Report, p. 4.

31.     Arsenic is the most dangerous of the Toxic Heavy Metals at issue and poses the most significant risk to human health.  *See*, Subcommittee Report, p. 10. Currently known risks of arsenic to health include respiratory, gastrointestinal, haematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[3]

32.     One study found negative effects in cognitive development of schoolchildren exposed to concentrations of arsenic over 5 ppb. For the authors of the study, 5 ppb was an important threshold for small children.[4] Consumer reports has recommended setting the limit of arsenic at 3 ppb.

33.     Hain sold finished baby food products using ingredients (such as organic brown rice flour) containing as much as 309 ppb arsenic, and finished products containing as much as 129 ppb arsenic. *See* Subcommittee Report, p. 3.

34.     Hain exceeded its own unreasonable and excessive internal standards. For many ingredients in Earth's Best Brand Baby Food, Hain set a standard for certain ingredients of 100 ppb and up to 200 ppb for arsenic. *See* Subcommittee Report, p. 16. Despite that, Hain approved and used a vitamin pre-mix with arsenic levels of 223 ppb, more than twice the specific limit that Hain set at 100 ppb for this ingredient, which is itself excessive. *See*, Subcommittee Report, p. 16.

---

[3] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019), available at http://www.atsdr.cdc.gov/spl/index.html#2019spl.
[4] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/).

Numerous other ingredients were used in Earth's Best Brand Baby Food that contained excessive levels of arsenic according to Hain's own testing, including organic whole raisins, organic soft white wheat flour, organic spelt flour, organic barley malt extract, organic yellow split pea powder, medium grain whole rice, organic brown rice flour, organic blueberry puree, organic barley flour, organic cinnamon powder, and organic butternut squash puree.

### *Lead in Defendant's Baby Food*

35.     Lead was also present in Defendant's baby food. In particular, Earth's Best Brand Baby Food was found to contain ingredients with as much as 352 ppb lead, and it has six ingredients that contained as high as 200 ppb lead.  *See*, Subcommittee Report, p. 3.

36.     For comparison, the FDA has set the maximum level of lead in bottled water at 5 ppb.  *See*, Subcommittee Report, p. 4.

37.     Lead is the second most dangerous of the Toxic Heavy Metals discussed in the Subcommittee Report. Because lead can accumulate in the body, even small doses of lead have deleterious effects on children, including health, behavioral, cognitive, and development issues. The FDA states that "[h]igh levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system."[5] There is a growing consensus that lead levels in baby food should not exceed 1 ppb. Healthy Babies Bright Futures concludes that no measurable amount of lead should be in baby food.

38.     At least two studies have established a significant association between early childhood exposure to lead and decreased standardized test scores, academic achievement, and

---

[5] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food.

diseases such as attention-deficit/hyperactivity disorder ("ADHD"). These effects last into adulthood according to other studies.[6]

39.     Hain, under its Earth's Best Organic label, used ingredients (such as vitamin pre-mix) containing as much as 352 ppb lead. Eighty-eight different ingredients in Earth's Best Brand Baby Food tested over 20 ppb lead, and six ingredients tested over 200 ppb lead, including organic whole raisins, organic whole wheat fine flour, organic quick oats, organic oat flour, organic barley flour, organic spelt flour, IQF organic green peas, organic cinnamon powder, organic pasta spaghetti, organic red lentils, organic green lentils, organic spelt flour, organic oat fiber, organic whole wheat white flour, organic sweet potato puree, organic prune puree, organic cranberry puree, organic butternut squash puree, organic blueberry puree, organic raspberry puree, organic pineapple juice concentrate, organic orange juice concentrate, organic brown rice flour, organic peach puree, organic raisin paste, organic quinoa flour, and organic date paste. *See* Subcommittee Report, p. 26.

40.     All of Hain's ingredients contained 1 or more ppb of lead, the limit recommended by some groups.

### *Cadmium in Defendant's Baby Food*

41.     Cadmium was another Toxic Heavy Metal found to be present in all brands of baby food subject to the House Subcommittee's investigation.  *See*, Subcommittee Report, p. 3.  In particular, Earth's Best Brand Baby Food used 102 ingredients that contained over 20 ppb

---

[6] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement: Evidence From Detroit Public Schools*, available at: http://mediad.publicbroadcasting.net/p/michigan/files/201302/AJPH.2012.pdf; Anne Evens *et al.*, *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools: A Population-Based Retrospective Cohort Study*, available at: https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9; Maitreyi Mazumdar *et al.*, *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function: A Follow-Up Study*, available at: www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/.

8

cadmium, with some of those ingredients containing up to 260 ppb cadmium.  *See*, Subcommittee Report, p. 3.

42.     For comparison, the FDA has set the maximum level of cadmium in bottled water at 5 ppb.  *See*, Subcommittee Report, p. 4.

43.     Cadmium is the seventh most dangerous heavy metal toxin according to the ATSDR. Exposure to cadmium is linked with decreases in IQ and development of ADHD. The EPA and FDA set the limit at 5 ppb of cadmium in drinking water and bottled water. The WHO limits cadmium in drinking water at 3 ppb. Certain experts recommend an upper limit of 1 ppb of cadmium in fruit juices.

44.     In Earth's Best Brand Baby Food, Hain used 102 ingredients with 20 ppb cadmium or higher. Some ingredients (such as organic barley flour) tested as high as 260 ppb cadmium. *See* Subcommittee Report, pp. 30–31. Other individual ingredients in Earth's Best Brand Baby Food containing excessive cadmium include: vitamin premix, IQF organic chopped broccoli, IQF organic spinach, IQF organic celery, IQF organic leek, organic date paste, organic cinnamon powder, organic brown flax milled, organic yellow papaya puree, organic whole wheat fine flour, organic red lentils, organic oat flakes, organic oat flour, organic brown rice flour, organic raspberry puree, organic diced potatoes, organic basil leaf powder, organic low protein wheat flour, organic carrot puree, organic kamut flour, organic quick oats, organic quinoa flour, organic diced onions, organic soft white wheat flour, organic strawberry puree, tofu powder, organic spelt flour, organic pineapple juice concentrate, and organic soft red wheat flour.

### *Defendant's Internal Testing*

45.     The Subcommittee Report also noted that Hain routinely exceeded its own internal limits relative to the use of ingredients with arsenic, lead, and cadmium in Earth's Best Brand

Baby Food.  *See*, Subcommittee Report, p. 4.  Although Hain attempted to justify these deviations from its internal standards, it "admitted to FDA that its testing underestimated final product toxic heavy metal levels."  *See*, Subcommittee Report, p. 4.

### *Defendant's Baby Food*

46.     Defendant manufactures, distributes, advertises, markets, and sells brands of baby food evaluated in the Subcommittee Report.  Hain manufactures, distributes, advertises, markets, and sells Earth's Best Brand Baby Food.

47.     Defendant directs, controls, and participates in the manufacturing and packaging of the baby food products that it sells. As part of that direction, control, and participation, Defendant determines and is responsible for the ingredients used in its baby food.

48.     Defendant knows and is responsible for the ingredients in the baby food products that it sells.

49.     Defendant created, developed, reviewed, authorized, and is responsible for the textual and graphic content on the packaging of the baby food products that it sells.  The labels on Earth's Best Brand Baby Food contain the Earth's Best trademark—which is one of Hain's federally registered trademarks—and note that Earth's Best Brand Baby Food is distributed by Hain.

50.     Each package of Earth's Best Brand Baby Food contains standardized labeling created, developed, reviewed, and authorized by Hain. The packaging of all types of Earth's Best Brand Baby Food is the same or substantially similar.

51.     Defendant knew, created, developed, reviewed and is responsible for the representations contained on each package of baby food that it sells.

10

52.     The labels on some of the varieties of Earth's Best Brand Baby Food—including some of those that Plaintiffs and Class members purchased—state that the product used "non-BPA packaging." BPA stands for bisphenol A, "an industrial chemical that has been used to make certain plastics and resins since the 1960s" that is linked to certain health issues.[7] In other words, these varieties of Earth's Best Brand Baby Food are marketed as *lacking* a particular dangerous substance that can negatively affect brain development and children's behavior.

53.     The labels on many varieties of Earth's Best Brand Baby Food—including some of those that Plaintiffs and Class members purchased—tout those products as being free of GMO—which stands for "genetically modified organism"—ingredients. Like BPA, GMOs are also believed to be associated with health risks, "including infertility, immune problems, accelerated aging, faulty insulin regulation and changes in major organs and the gastrointestinal system."[8] As such, these varieties of Earth's Best Brand Baby Food are marketed as *lacking* a dangerous substance that can negatively affect consumers of the product.

54.     Despite touting the lack of certain dangerous substances in its baby food, Defendant fails to disclose elevated levels of Toxic Heavy Metals on the labels of Defendant's baby food products.

55.     While Defendant's omissions regarding the material fact that its baby food products contain elevated levels of Toxic Heavy Metals are legally significant on their own, Defendant's representations regarding the presence of "iron to help support learning ability" and the lack of

---

[7]   Mayo Clinic, *What is BPA, and What Are the Concerns About BPA?*, available at: https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/expert-answers/bpa/faq-20058331 ("Some research has shown that BPA can seep into food or beverages from containers that are made with BPA," which "is a concern because of possible health effects of BPA on the brain and prostate gland of fetuses, infants and children. It can also affect children's behavior. Additional research suggests a possible link between BPA and increased blood pressure.").

[8] CNN, *10 Ways to Keep Your Diet GMO-Free*, available at: https://www.cnn.com/2014/03/25/health/upwave-gmo-free-diet/index.html.

BPA and GMOs are also significant. Although these representations may be true, "a statement that is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 2015 IL App (2d) 140952, ¶ 33 (citing cases); *see also Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 265 (2nd Dist. 1993) ("A statement which is technically true as far as it goes may nonetheless be fraudulent if it is misleading because it does not state matters which materially qualify that statement."); W. Prosser, Law of Torts § 106, at 696 (4th ed. 1971) ("half the truth may obviously amount to a lie, if it is understood to be the whole.").

56.    For example, in representing that Defendant's baby food products lack BPA and GMOs, Defendant represents that its baby food products lack substances that consumers would consider to be deleterious to human health. This is, however, only a "half-truth" as Defendant's baby food products do, in fact, contain deleterious substances—*i.e.*, Toxic Heavy Metals.

### *Consumer Expectations Regarding Baby Food*

57.    Parents' instinctive desire to protect and ensure the healthy development of their children is well-known. As such, the safety of baby food is of paramount importance, and is a material fact, to consumers (such as Plaintiffs and Class members).

58.    More specifically, given the negative effects of Toxic Heavy Metals (such as arsenic, lead, cadmium, and mercury) on child development, the presence of these substances in baby food is a material fact to consumers (such as Plaintiffs and members of the Class). Indeed, consumers—such as Plaintiffs and members of the Class—are unwilling to purchase baby food that contains elevated levels of Toxic Heavy Metals.

59.    Defendant knows that the safety of its brand of baby food (as a general matter) is a material fact to consumers. This is exemplified by the fact that Defendant's baby food products

are marketed and labeled as *lacking* certain substances (*e.g.*, BPA, GMOs) that consumers believe would be deleterious to the health of children.

60.     Defendant also knows that consumers (such as Plaintiffs and members of the Class) are unwilling to purchase its baby food products that contain elevated levels of Toxic Heavy Metals.

61.     As such, Defendant also knows that the presence of Toxic Heavy Metals in its baby food products is a material fact to consumers (such as Plaintiffs and Class members).

62.     Baby food manufacturers (such as Defendant) hold a special position of public trust. Consumers believe that they would not sell products that are unsafe to their infants. *See*, Subcommittee Report, p. 6.

63.     Defendant knew that if the elevated levels of Toxic Heavy Metals in its baby food products was disclosed to Plaintiffs and Class members, then Plaintiffs and Class members would be unwilling to purchase Defendant's Baby Food.

64.     In light of Defendant's knowledge that Plaintiffs and Class members would be unwilling to purchase baby food if they knew that its baby food products contained elevated levels of Toxic Heavy Metals, Defendant intentionally and knowingly concealed this fact from Plaintiffs and Class members, and did not disclose the presence of these Toxic Heavy Metals on the labels of Defendant's baby food products.

65.     Defendant knew that Plaintiffs and Class members would rely upon the representations and omissions contained on the packages of Defendant's baby food products, and intended for them to do so.

66.     Defendant knew that in relying upon the representations and omissions contained on the packages of Defendant's baby food products, Plaintiffs and Class members would view

those products as being safe for consumption, given their represented lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that baby food products contained elevated levels of Toxic Heavy Metals.

67.     Prior to purchasing Defendant's baby food products, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, and relied upon them.

68.     As a result of Defendant's representations regarding the safety of its baby food, and the lack of certain deleterious substances (*e.g.*, BPA, GMOs), and Defendant's concealment of the fact that its brand of baby food contained elevated levels of Toxic Heavy Metals, Plaintiffs and Class members reasonably believed that Defendant's baby food products were free from substances that would negatively affect children's development.

69.     In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased Defendant's baby food products.

70.     Had Plaintiffs and Class members known the truth—*i.e.*, that Defendant's brand of baby food contained elevated levels of Toxic Heavy Metals, rendering it unsafe for consumption by children—they would not have been willing to purchase it at all.

71.     Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members purchased Defendant's baby food products.

72.     Plaintiffs and Class members were harmed in the form of the money they paid for Defendant's baby food products which they would not otherwise have paid had they known the truth.  Since the presence of elevated levels of Toxic Heavy Metals in baby food renders it unsafe

for human consumption, the Defendant's baby food products that Plaintiffs and Class members purchased is worthless.

### Plaintiff Edelin Altuve Purchased Defendant's Contaminated Baby Food

73. On numerous occasions between March 2020 and February 2021, Altuve purchased several different varieties of Earth's Best Brand Baby Food in North Dakota and Florida. Many of the varieties of Earth's Best Brand Baby Food that Altuve purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.      Earth's Best Brand Baby Food from Hain containing organic quinoa flour, organic rice, and organic butternut squash puree with excessive levels of one or more Toxic Heavy Metals, including Organic Turkey Quinoa Apple Sweet Potato Homestyle Meal Puree, Organic Chicken Casserole with Vegetables & Rice, and Organic Four Bean Feast with Vegetables.

### Plaintiff Brandy Daniels Purchased Defendant's Contaminated Baby Food

74. On numerous occasions in 2020, Daniels purchased several different varieties of Earth's Best Brand Baby Food in North Carolina. Many of the varieties of Earth's Best Brand Baby Food that Daniels purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.      Earth's Best Brand Baby Food from Hain containing organic green peas with excessive levels of one or more Toxic Heavy Metals, including Pea Puree.

### Plaintiff Diego Galeana Purchased Defendant's Contaminated Baby Food

75. On numerous occasions in 2020 and 2021 Galeana purchased several different varieties of Earth's Best Brand Baby Food in Illinois. Many of the varieties of Earth's Best Brand Baby Food that Galeana purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.     Earth's Best Brand Baby Food from Hain containing organic oat flour, and organic oat flakes with excessive levels of one or more Toxic Heavy Metals, including Earth's Best Organic and Conventional Whole Grain Oatmeal Cereal, and Earth's Best Organic Stage 3 Baby Food Puree Pumpkin Cranberry Apple.

**Plaintiff Aileen Garces Purchased Defendant's Contaminated Baby Food**

76.     On numerous occasions between November 2020 and February 4, 2021, Garces purchased several different varieties of Earth's Best Brand Baby Food in Illinois. Many of the varieties of Earth's Best Brand Baby Food that Garces purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.     Earth's Best Brand Baby Food from Hain containing vitamin premix, organic raisins, organic rice flour, organic blueberry puree, organic whole grain barley flour, organic brown flax milled, organic cinnamon, and organic whole grain oat flour with excessive levels of one or more Toxic Heavy Metals, including Organic Blueberry Banana Flax & Oat Wholesome Breakfast Puree, Organic Apple Peach Oatmeal Wholesome Breakfast Puree, Apple Raisin Flax & Oat Wholesome Breakfast Puree, Sweet Potato Cinnamon Flax & Oat Wholesome Breakfast Puree, and Organic Rice Cereal.

**Plaintiff April Gillens Purchased Defendant's Contaminated Baby Food**

77.     On numerous occasions between September 2020 and February 2021, Gillens purchased several different varieties of Earth's Best Brand Baby Food in Washington, D.C. Many of the varieties of Earth's Best Brand Baby Food that Gillens purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

      a.     Earth's Best Brand Baby Food from Hain containing organic sweet potato puree and organic orange juice concentrate with excessive levels of one or more Toxic Heavy Metals, including Sweet Potato Puree Organic Baby Food, and Organic Orange Banana Puree.

*Plaintiff Elizabeth Hall Purchased Defendant's Contaminated Baby Food*

78. On numerous occasions between 2019 and 2021, Hall purchased Earth's Best Brand Baby Food in New Hampshire. Many of the varieties of Earth's Best Brand Baby Food that Hall purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Earth's Best Brand Baby Food from Hain containing peach and blueberry with excessive levels of one or more Toxic Heavy Metals, including Banana Blueberry Pouch and Peach Mango Pouch.

*Plaintiff Savanna Jarrell Purchased Defendant's Contaminated Baby Food*

79. On numerous occasions between January 2015 and December 2020, Jarrell purchased Earth's Best Brand Baby Food in Kentucky. Many of the varieties of Earth's Best Brand Baby Food that Jarrell purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Earth's Best Brand Baby Food from Hain containing organic sweet potato puree, organic cinnamon powder, organic flax, organic oats, organic blueberry puree, and organic rice flour with excessive levels of one or more Toxic Heavy Metals, including Organic Sweet Potato Cinnamon Flax & Oat Stage 2 Breakfast Puree, Organic Wholesome Breakfast Blueberry Banana Flax & Oat Stage 2 Baby Food, Organic Banana Blueberry Stage 2 Baby Food Puree Pouch, Organic Banana Raspberry Brown Rice Fruit & Grain Puree, and Organic Pumpkin Cranberry & Apple Stage 3 Baby Food Puree.

*Plaintiff Laszlo Kovacs Purchased Defendant's Contaminated Baby Food*

80. On numerous occasions between 2015 and 2021, Kovacs purchased Earth's Best Brand Baby Food in Tennessee. Many of the varieties of Earth's Best Brand Baby Food that Kovacs purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Earth's Best Brand Baby Food from Hain containing organic strawberry with excessive levels of Toxic Heavy Metals, including Strawberry Banana Fruit Yogurt Smoothie.

*Plaintiff Cori Lau Purchased Defendant's Contaminated Baby Food*

81.     On numerous occasions in 2019 and 2020, Lau purchased several different varieties of Earth's Best Brand Baby Food in Nevada. Many varieties of Earth's Best Brand Baby Food that Lau purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.     Earth's Best Brand Baby Food from Hain containing whole wheat flour, organic oats, and organic cinnamon containing excessive levels of one or more Toxic Heavy Metals, including Organic Breakfast Biscuit Blueberry.

*Plaintiff Michelle Lyles Purchased Defendant's Contaminated Baby Food*

82.     On numerous occasions between March 2020 and February 2021, Lyles purchased several different varieties of Earth's Best Brand Baby Food in Maryland. Many of the varieties of Earth's Best Brand Baby Food that Lyles purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.     Earth's Best Brand Baby Food from Hain containing rice flour, oats, and cinnamon, with excessive levels of one or more Toxic Heavy Metals, including Organic Infant Rice Cereal, Organic MultiGrain Cereal, Carrot Puree, and Apple Cinnamon Oatmeal.

*Plaintiff Christina Martinson Purchased Defendant's Contaminated Baby Food*

83.     On numerous occasions from approximately August 2020 to January 2021, Martinson purchased several different varieties of Earth's Best Brand Baby Food in Georgia. Many of the varieties of Earth's Best Brand Baby Food that Martinson purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

> a.     Earth's Best Brand Baby Food from Hain containing organic butternut squash, organic raspberry puree, organic brown rice, organic peach, organic raisin paste, organic flax, cinnamon, and oat with excessive levels of one or more Toxic Heavy Metals, including Organic Butternut Squash Pear Baby

18

Food Puree, Organic Banana Raspberry & Brown Rice Fruit & Grain Puree, Organic Apple Peach Oatmeal, Organic Orange Banana Baby Food Puree, Organic Apple Raisin Flax & Oat, and Organic Sweet Potato Cinnamon Flax & Oat.

### *Plaintiff Stacy Musto Purchased Defendant's Contaminated Baby Food*

84.     On numerous occasions in 2019-2020, Musto purchased several different varieties of Earth's Best Brand Baby Food in Missouri. Many of the varieties of Earth's Best Brand Baby Food that Musto purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Earth's Best Brand Baby Food from Hain containing organic strawberry, organic spinach, organic red lentil, and organic rice flour with excessive levels of one or more Toxic Heavy Metals, including Organic Stage 2 Baby Food Spinach Lentil Brown Rice Pouch.

### *Plaintiff Chris Nalley Purchased Defendant's Contaminated Baby Food*

85.     On numerous occasions between May 2020 and early February 2021, Nalley purchased several different varieties of Earth's Best Brand Baby Food in Missouri. Many of the varieties of Earth's Best Brand Baby Food that Nalley purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

    a.    Earth's Best Brand Baby Food from Hain containing brown rice, banana, raspberry, and organic blueberry puree with excessive levels of one or more Toxic Heavy Metals, including Organic Banana Raspberry & Brown Rice Fruit & Grain Puree, Organic Sweet Potato & Apple Baby Food Puree, and Organic Banana Blueberry Baby Food Puree.

### *Plaintiff Gladys Okolo Purchased Defendant's Contaminated Baby Food*

86.     On numerous occasions between July 2020 and January 2021, Okolo purchased several different varieties of Earth's Best Brand Baby Food in Virginia. Many of the varieties of

Earth's Best Brand Baby Food that Okolo purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

     a.    Earth's Best Brand Baby Food from Hain containing sweet potato with excessive levels of one or more Toxic Heavy Metals, including Organic Sweet Potatoes and Chicken.

### *Plaintiff Lidia Tilahun Purchased Defendant's Contaminated Baby Food*

87.    On numerous occasions between 2019 and 2020, Tilahun purchased several varieties of Earth's Best Brand Baby Food in California. Many of the varieties of Earth's Best Brand Baby Food that Tilahun purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

     a.    Earth's Best Brand Baby Food from Hain containing organic carrot puree with excessive levels of one or more Toxic Heavy Metals, including Earth's Best Organic Stage 2 Carrots.

### *Plaintiff Damen Walton Purchased Defendant's Contaminated Baby Food*

88.    On numerous occasions between June 2020 and February 2021, Walton purchased Earth's Best Brand Baby Food in Iowa. Many of the varieties of Earth's Best Brand Baby Food that Walton purchased contained ingredients with excessive levels of Toxic Heavy Metals discussed in the Subcommittee Report, including the following:

     a.    Earth's Best Brand Baby Food from Hain containing sweet potato, apples, and blueberries with excessive levels of one or more Toxic Heavy Metals, including Sweet Potato Puree, Apple Puree, and Blueberries Puree.

### *Facts Relating to All Plaintiffs and Class Members*

89.    Prior to purchasing Earth's Best Brand Baby Food in retail stores and/or while shopping online, Plaintiffs and Class members were exposed to, saw, read, and understood Defendant's representations and omissions regarding the safety of its baby food, as well as the

presence of elevated levels of Toxic Heavy Metals therein, and Plaintiffs and Class members relied upon them.

90.      Plaintiffs and Class members were only willing to purchase Earth's Best Brand Baby Food because they believed that the baby food did *not* contain elevated levels of Toxic Heavy Metals. Defendant advertises, markets, promotes, and sells food products specifically directed to babies and children, and conveys to consumers that its food is wholesome and is designed to meet the unique nutritional and developmental needs of growing children. Plaintiffs' and Class members' belief that Defendant's baby food products were healthy and thus did not contain deleterious and toxic substances in unreasonable and excessive levels is bolstered by Defendant's representations regarding the presence of iron, representations of natural ingredients, representations that its products are organic, and the *lack* of BPA and GMOs in its brand of baby food.

91.      In reliance upon Defendant's representations and omissions, Plaintiffs and Class members purchased Earth's Best Brand Baby Food.

92.      Had Plaintiffs and Class members known the truth regarding the excessive levels of Toxic Heavy Metals in Defendant's baby food products, they would not have purchased them.

93.      The presence of Toxic Heavy Metals at the levels found in the Subcommittee Report in Earth's Best Brand Baby Food renders the baby food that Plaintiffs and Class members purchased worthless, unsafe for human consumption, and to an even greater extent not suited for consumption by the most vulnerable humans.

94.      Therefore, as a direct and proximate result of Defendant's misrepresentations and omissions concerning its brand of baby food, Plaintiffs and Class members suffered injury in fact

in the form of the money they paid for Earth's Best Brand Baby Food—money they would not otherwise have paid to Defendant had they known the truth.

95.     Plaintiffs bring this action on behalf of themselves, and Classes of similarly situated individuals, seeking recovery of damages, including actual damages, enhanced, statutory, and punitive damages, as well as equitable relief, including restitution, disgorgement, and injunctive relief, reasonable attorneys' fees and costs, as allowed under the various causes of action set forth herein.

96.     Plaintiffs are likely to consider purchasing baby food products in the future provided that Defendant institutes corrective measures and cures its unfair and deceptive acts and practices. Should Defendant provide clear and non-misleading disclosures regarding the levels of Toxic Heavy Metals in its baby food, improve its sourcing of ingredients and manufacturing processes, and accurately and effectively test final products of its baby food for excessive levels of Toxic Heavy Metals, Plaintiffs would likely purchase baby food products from Defendant if they are truthfully labeled and do not contain excessive levels of Toxic Heavy Metals or other deleterious substances material to a parent or guardian's decision to purchase and feed food to their vulnerable and developing babies and children.

97.     Defendant is equitably estopped from asserting defenses relating to statutes of limitations. Not only did Defendant fail to disclose the elevated levels of Toxic Heavy Metals in its baby food, but Defendant also touted its brand of baby food as wholesome, natural, specially prepared to meet nutritional and developmental needs of babies and children, and lacking certain undesired substances, such as BPA and GMOs, and including certain beneficial substances, such as iron. In addition, Defendant concealed facts regarding the presence of Toxic Heavy Metals in its baby food by purposefully refusing to test the final products and relying upon flawed theoretical

22

models to erroneously claim the levels of Toxic Heavy Metals in its finished products do not exceed Defendant's unreasonably high internal limits. Defendant also omitted and concealed the facts regarding the presence of Toxic Heavy Metals from the FDA and Congress. Finally, Defendant learned of the excessive levels of Toxic Heavy Metals in its baby food products through its own internal testing, and it knew about the excessive levels of Toxic Heavy Metals in its competitors' baby food products, yet it failed and refused to disclose that its competitors' products were unsafe for human consumption because all of its products were similarly unsafe for human consumption. As such, Defendant actively and fraudulently concealed the true nature of the baby food.

## <u>CLASS ALLEGATIONS</u>

98.    **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons in the United States who purchased Earth's Best Brand Baby Food.

99.    **California Subclass Definition:** Tilahun brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("California Subclass"), defined as follows:

> All persons in California who purchased Earth's Best Brand Baby Food.

100.    **Florida Subclass Definition:** Altuve brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Florida Subclass"), defined as follows:

> All persons in Florida who purchased Earth's Best Brand Baby Food.

101.     **Georgia Subclass Definition**: Martinson brings this action pursuant to Fed. R. Civ. P. 23, on behalf of similarly situated individuals and entities ("Georgia Subclass"), defined as follows:

All persons in Georgia who purchased Earth's Best Brand Baby Food.

102.     **Illinois Subclass Definition:** Garces and Galeana bring this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Illinois Subclass"), defined as follows:

All persons in Illinois who purchased Earth's Best Brand Baby Food.

103.     **Iowa Subclass Definition**: Walton brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Iowa Subclass"), defined as follows:

All persons in Iowa who purchased Earth's Best Brand Baby Food.

104.     **Kentucky Subclass Definition:** Jarrell brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Kentucky Subclass"), defined as follows:

All persons in Kentucky who purchased Earth's Best Brand Baby Food.

105.     **Maryland Subclass Definition:** Lyles brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Maryland Subclass"), defined as follows:

All persons in Maryland who purchased Earth's Best Brand Baby Food.

106.     **Missouri Subclass Definition**: Musto and Nalley bring this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("Missouri Subclass"), defined as follows:

All persons in Missouri who purchased Earth's Best Baby Food.

107. **Nevada Subclass Definition:** Lau brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Nevada Subclass"), defined as follows:

All persons in Nevada who purchased Earth's Best Baby Food.

108. **New Hampshire Subclass Definition:** Hall brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("New Hampshire Subclass"), defined as follows:

All persons in New Hampshire who purchased Earth's Best Baby Food.

109. **North Carolina Subclass Definition**: Daniels brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Carolina Subclass"), defined as follows:

All persons in North Carolina who purchased Earth's Best Brand Baby Food.

110. **North Dakota Subclass Definition:** Altuve brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("North Dakota Subclass"), defined as follows:

All persons in North Dakota who purchased Earth's Best Brand Baby Food.

111. **Tennessee Subclass Definition**: Kovacs brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Tennessee Subclass"), defined as follows:

All persons in Tennessee who purchased Earth's Best Brand Baby Food.

112. **Virginia Subclass Definition**: Okolo brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Virginia Subclass"), defined as follows:

> All persons in Virginia who purchased Earth's Best Brand Baby Food.

113. **Washington D.C. Subclass Definition**: Gillens brings this action pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities ("Washington D.C. Subclass"), defined as follows:

> All persons in Washington D.C. who purchased Earth's Best Brand Baby Food.

114. Excluded from the Class and Subclasses are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class and Subclass(es); (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

115. **Numerosity**: The Class and Subclasses are each so numerous that joinder of individual members would be impracticable. While the exact number of Class members and Subclass members is presently unknown and can only be ascertained through discovery, Plaintiff believes that there are thousands of Class and Subclass members, if not more, as Defendant is one of the seven largest manufacturers of baby food in the United States. *See*, Subcommittee Report, p. 2.

116.   **Commonality and Predominance**: There are several questions of law and fact common to the claims of the Plaintiffs and members of the Classes, which predominate over any individual issues, including:

    a.    Whether the Earth's Best Brand Baby Food contains unsafe levels of Toxic Heavy Metals;

    b.    Whether Defendant misrepresented to Plaintiffs and Class members that Earth's Best Brand Baby Food was safe for human consumption and did not contain elevated levels of Toxic Heavy Metals;

    c.    Whether Defendant omitted and concealed the levels of Toxic Heavy Metals in Earth's Best Brand Baby Food;

    d.    Whether the presence of elevated levels of Toxic Heavy Metals in Earth's Best Brand Baby Food is a material fact to Plaintiffs and Class members;

    e.    The extent and amount of Plaintiffs' and Class members' damages;

    f.    Whether Defendant's conduct constitutes unlawful acts or practices under each of the state consumer protection and unfair or deceptive practices statutes asserted herein;

    g.    Whether Defendant's conduct constitutes fraudulent concealment;

    h.    Whether Defendant was unjustly enriched by their improper conduct;

    i.    Whether Plaintiffs and Class members are entitled to injunctive relief to (1) require Defendant to cease its unlawful and deceptive practices; (2) to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure its baby food does not contain unsafe and unacceptable levels of heavy metals; and (3) impose clear and prominent disclosure requirements on its product packaging regarding the levels of Toxic Heavy Metals in its finished products; and

    j.    Whether Defendant's conduct resulted in Defendant unjustly retaining a benefit to the detriment of Plaintiffs and Class members, and violated the fundamental principles of justice, equity, and good conscience.

117.   **Typicality**: Plaintiffs' claims are typical of the claims of the proposed Classes. All claims are based on the same legal and factual issues regarding Defendant's misrepresentations

and omissions concerning the presence of elevated levels of Toxic Heavy Metals in Earth's Best Brand Baby Food.

118.    **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the proposed Classes, and Plaintiffs do not have any interests antagonistic to those of the proposed Classes.  Plaintiffs have retained competent counsel experienced in the prosecution of this type of litigation.

119.    **Superiority**: A class action can best secure the economies of time, effort and expense, and promote uniformity. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually. Individual actions are not feasible and it is unlikely that individual members of the Class will prosecute separate actions. The trial and the litigation of Plaintiffs' claims as a class action will be manageable.

**COUNT 1**
**(On Behalf of Plaintiff Tilahun and the California Subclass)**
**Violation of California Business & Professions Code §§ 17200, *et seq*.**
**for Engaging in Unlawful, Unfair, and Deceptive Business Acts or Practices**

120.    Plaintiff repeats paragraphs 1–119 as if fully set forth herein.

121.    California Business & Professions Code section 17200 (California's Unfair Competition Law) prohibits "unlawful," "unfair," or "fraudulent" business acts or practices and any false or misleading advertising.

122.    California Business & Professions Code section 17203 provides in pertinent part:

> Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as

28

> may be necessary to restore to any person in interest any money or property,
> real or personal, which may have been acquired by means of such unfair
> competition. Any person may pursue representative claims or relief on behalf
> of others only if the claimant meets the standing requirements of Section
> 17204 and complies with Section 382 of the Code of Civil Procedure . . .

123. As alleged above, Defendant has engaged and continues to unlawfully engage in fraudulent, unfair, and unlawful business practices by making false representations and omissions of material fact regarding its brand of baby food, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

124. In the course of conducting business, Defendant committed unfair business practices by, among other things, misrepresenting and omitting material facts regarding the characteristic, benefits, and ingredients of its baby food products.

125. Defendant knew of, or was willfully blind to, the excessive levels of Toxic Heavy Metals in its baby food products that it manufactured, packaged, marketed, distributed, and sold to Plaintiff and the California Subclass, as Defendant's internal testing showed the excessive levels of Toxic Heavy Metals in the products.

126. In the course of conducting business, Defendant committed unlawful acts and practices by, among other things, selling to Plaintiff Tilahun and the California Subclass members baby food products that were misbranded and adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. §331, and California Health and Safety Code §110545, because they were, bear, or contain non-naturally occurring and/or excessive levels of poisonous and deleterious substances that render them injurious to health of the baby and children who were the intended consumers of the baby food products, and under California Health and Safety Code §110555, because they bear and contain food additives that are unsafe. *See* Cal. Health & Safety Code §§ 110625, 110630.

29

127.    In the course of conducting business, Defendant committed fraudulent acts or practices in violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17203.

128.    In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

129.    Defendant intended that Plaintiff Tilahun and California Subclass members rely on its false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

130.    Plaintiff Tilahun and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

131.    Acting as reasonable consumers, had Plaintiff Tilahun and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

132.    Plaintiff Tilahun and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Earth's Best Brand Baby Food under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

133.    Acting as reasonable consumers, Plaintiff Tilahun and California Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food

requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Tilahun and California Subclass members first purchasing Defendant's baby food products.

134.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiff Tilahun and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

<u>**COUNT 2**</u>
**(On Behalf of Plaintiff Tilahun and the California Subclass)**
**Violation of California Consumer Legal Remedies Act, Cal. Civ. Code § 1770, *et seq.*[9]**

135.    Plaintiff Tilahun repeats paragraphs 1–119 as if fully set forth herein.

136.    Defendant is a person under Cal. Civ. Code § 1761(c).

137.    Plaintiff is a consumer under Cal. Civ. Code § 1761(d) who purchased Defendant's baby food products.

138.    California's Consumer Legal Remedies Act, Cal. Civ. Code §1770, *et seq.* ("CLRA"), prohibits unfair methods of competition and unfair or deceptive acts or practices intended to result in the sale of goods to consumers, including but not limited to:

a.    Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have (§ 1770(a)(5));

b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another (§ 1770(a)(7));

---

[9] Tilahun has sent a demand letter to Defendant, and reserve the right to amend her claims to include a claim for damages under the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1770, *et seq.*, should Defendant fail to timely and satisfactorily meet her demands.

31

c.    Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

139.    Defendant violated the foregoing provisions of the CLRA by selling its baby food products that were unsafe for human consumption, and by omitting that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

140.    In the course of conducting business, Defendant committed fraudulent acts and practices by, among other things, making the aforementioned misrepresentations, omissions, and concealment that possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

141.    Defendant intended that Plaintiff Tilahun and California Subclass members rely on their false statements, misrepresentations, omissions, and concealment of material fact in purchasing its baby food products.

142.    Plaintiff Tilahun and California Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased its baby food products.

143.    Acting as reasonable consumers, had Plaintiff Tilahun and California Subclass members been aware of the truth regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

144.    Plaintiff Tilahun and California Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

145.    Acting as reasonable consumers, Plaintiff Tilahun and California Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food

32

products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Tilahun and California Subclass members first purchasing Defendant's baby food products.

146.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts or practices, Plaintiff Tilahun and members of the California Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

147.    Pursuant to § 1782(d) of the CLRA, Plaintiff Tilahun, individually and on behalf of similarly situated California Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing.

148.    Plaintiff Tilahun has provided the requisite notice and demand letter to Defendant, and seek monetary damages and all other forms of relief to which they are entitled.

### <u>COUNT 3</u>
**(On Behalf of Plaintiff Altuve and the Florida Subclass)**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. § 501.201,** *et seq.*

149.    Plaintiff Altuve repeats paragraphs 1–119 as if fully set forth herein.

150.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA"), provides protection to consumers by mandating fair competition in commercial markets for goods and services.

151.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

152.    The FDUTPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Fla. Stat. § 501.203(8).

153.    Plaintiff Altuve and each member of the Florida Subclass are "consumers," as defined by Fla. Stat. § 501.203(7).

154.    Defendant's baby food products fall within FDUTPA because they are a "good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value." Fla. Stat. § 501.203(8).

155.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that their brands of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

156.    Defendant's misrepresentations, omissions, and concealment regarding its baby food products constitute deceptive and unconscionable acts or practices prohibited by the FDUTPA.

157.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

34

158.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Altuve and the Florida Subclass.

159.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

160.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Fla. Stat. § 500.11.

161.     Defendant intended that Plaintiff Altuve and Florida Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

162.     Plaintiff Altuve and Florida Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased its baby food products.

163.     Acting as reasonable consumers, had Plaintiff Altuve and Florida Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase the products.

164.     Plaintiff Altuve and Florida Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

165.     Acting as reasonable consumers, Plaintiff Altuve and Florida Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated

levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Altuve and Florida Subclass members first purchasing Defendant's baby food products.

166. As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Altuve and members of the Florida Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

167. Plaintiff Altuve, individually and on behalf of similarly situated Florida Subclass members, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to remove its unsafe products from store shelves and recall all of its products containing ingredients that render its baby food unsafe for human consumption, and take other corrective measures, such as corrective labeling and improvement of food manufacturing standards, procedures, and testing. Plaintiff Altuve and Florida Subclass members also seek damages, equitable relief, attorney's fees and costs, to the furthest extent allowed under Florida law.

**COUNT 4**
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Uniform Deceptive Trade Practices Act ("GUDTPA")**
**O.C.G.A. §§ 10-1-370, *et seq*.**

168. Plaintiff Martinson repeats paragraphs 1–119 as if fully set forth herein.

169. Plaintiff Martinson and the Georgia Subclass members are persons within the meaning of § 10-1-371(5) of the GUDTPA.

170.    Defendant engaged in deceptive trade practices in the conduct of its business, in violation of O.C.G.A. § 10-1-372(a), including:

    a.    Representing that goods or services have characteristics that they do not have;

    b.    Representing that goods or services are or a particular standard, quality, or grade if they are of another;

    c.    Advertising goods or services with intent not to sell them as advertised; and

    d.    Engaging in conduct that creates a likelihood of confusion or misunderstanding.

171.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Martinson and Georgia Subclass members.

172.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

173.    Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

174.    Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

175.    Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

176.    Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

177.    Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Martinson and Georgia Subclass members first purchasing Defendant's baby food products.

178.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals. Plaintiff Martinson and Georgia Subclass members therefore seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

### COUNT 5
**(On Behalf of Plaintiff Martinson and the Georgia Subclass)**
**Violation of Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq*.**

179.    Plaintiff Martinson repeats paragraphs 1–119 as if fully set forth herein.

180.   The Fair Business Practices Act protects consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce. O.C.G.A. § 10-1-391(a).

181.   Plaintiff Martinson and Georgia Subclass members are "consumers." O.C.G.A. § 10-1-392(6).

182.   In the course of trade and commerce, Defendant sold its baby food products in consumer transactions. O.C.G.A § 10-1-392(10), (28).

183.    Defendant's false, misleading, and deceptive misrepresentations, and omissions, concealment, and suppression of material facts as described herein constitute the following unfair or deceptive acts and are unlawful: representing that foods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods are of a particular standard, quality, or grade or that goods are of a particular model or style, if they are of another; advertising goods with intent not to sell them as advertised. O.C.G.A. § 10-1-393(b)(5), (7), (9).

184.   Defendant intended that Plaintiff Martinson and Georgia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

185.   Plaintiff Martinson and Georgia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

186.   Acting as reasonable consumers, had Plaintiff Martinson and Georgia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

187. Plaintiff Martinson and Georgia Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that they were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

188. Acting as reasonable consumers, Plaintiff Martinson and Georgia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not readily available to Plaintiff Martinson and Georgia Subclass members at the time they purchased Defendant's baby food products.

189. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Martinson and Georgia Subclass members suffered damages and ascertainable losses of money and property by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

190. All conditions precedent have occurred or been performed, including the sending of a proper demand letter.

### COUNT 6
**(On Behalf of Plaintiffs Garces, Galeana, and the Illinois Subclass)**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"),**
**815 ILCS 505/1, *et seq.***

191. Plaintiffs Garces and Galeana repeat paragraphs 1–119 as if fully set forth herein.

192.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

193.     The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act". 815 ILCS 505/2.

194.     The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

195.     Defendant is a "person," as defined by 815 ILCS 505/1(c).

196.     Plaintiffs Garces, Galeana, and each member of the Illinois Subclass are "consumers," as defined by 815 ILCS 505/1(e), because they purchased Defendant's baby food products.

197.     Defendant's baby food products are "merchandise," as defined by 815 ILCS 505/1(b).

198.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

199.     Defendant's respective misrepresentations and omissions regarding Defendant's baby food products constitute deceptive and unfair acts or practices prohibited by the ICFA.

41

200. Defendant's aforementioned misrepresentations and omissions possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

201. Defendant's aforementioned misrepresentations and omissions were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Garces and Galeana and the Illinois Subclass.

202. Defendant's aforementioned misrepresentations and omissions are unfair business practices because they offend public policy and/or cause substantial injury to consumers.

203. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and section 620/11(a) of the Illinois Food, Drug, and Cosmetic Act.

204. Defendant intended that Plaintiffs Garces and Galeana and Illinois Subclass members rely on its aforementioned false statements, misrepresentations, and omissions of material fact in purchasing Defendant's baby food products.

205. Plaintiffs Garces, Galeana, and Illinois Subclass members reasonably relied on Defendant's misrepresentations and omissions when they purchased Defendant's baby food products.

206. Acting as reasonable consumers, had Plaintiffs Garces, Galeana, and Illinois Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

207. Plaintiffs Garces, Galeana, and Illinois Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief

42

that the products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

208.    Acting as reasonable consumers, Plaintiffs Garces, Galeana, and Illinois Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Illinois Subclass members first purchasing Defendant's baby food products.

209.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiffs Garces, Galeana, and members of the Illinois Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 7
**(On Behalf of Plaintiff Walton and the Iowa Subclass)**
**Violation of the Iowa Private Right of Action for Consumer Frauds Act,**
**Iowa Code §§ 714H.1, *et seq*. ("IPRACFA")**

210.    Plaintiff Walton repeats paragraphs 1–119 as if fully set forth herein.

211.    Iowa provides a right of action for consumer frauds. Iowa Code §§ 714H.1, *et seq*.

212.    Iowa prohibits unfair practices, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact. Iowa Code §§ 714H.3(1).

213.    Defendant's baby food products fall within IPRACFA because it is a consumer merchandise, and Plaintiff Walton and Iowa Subclass members are consumers within the meaning of IPRACFA. Iowa Code §§ 714H.2(3), (4).

214.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

215.    Defendant's respective misrepresentations, omissions, and concealment regarding its baby food products constitutes unfair, abusive, and deceptive acts or practices prohibited by the IPRACFA.

216.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

217.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Walton and the Iowa Subclass.

218.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

219.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Iowa Code § 190.3.

220.    Defendant intended that Plaintiff Walton and the Iowa Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

44

221.    Plaintiff Walton and Iowa Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

222.    Acting as reasonable consumers, had Plaintiff Walton and Iowa Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

223.    Plaintiff Walton and Iowa Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

224.    Acting as reasonable consumers, Plaintiff Walton and Iowa Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Walton and Iowa Subclass members first purchasing Defendant's baby food products.

225.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Walton and members of the Iowa Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

45

**COUNT 8**
**(On Behalf of Plaintiff Jarrell and the Kentucky Subclass)**
**Violation of Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110, *et seq*.**

226.     Plaintiff Jarrell repeats paragraphs 1–119 as if fully set forth herein.

227.     The Kentucky Consumer Protection Act ("KCPA") prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. § 367.170.

228.     The KCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices are in connection with the sale of consumer goods.

229.     Plaintiff Jarrell and each member of the Kentucky Subclass are persons within the meaning of Ky. Rev. Stat. § 367.220.

230.     Defendant's baby food products fall within KCPA because they are a consumer goods.

231.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

232.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair, abusive, and deceptive acts or practices prohibited by the KCPA.

233.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

46

234.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Jarrell and the Kentucky Subclass.

235.    Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

236.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Ky. Rev. Stat. §§ 217.025–217.045.

237.    Defendant intended that Plaintiff Jarrell and Kentucky Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

238.    Plaintiff Jarrell and Kentucky Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

239.    Acting as reasonable consumers, had Plaintiff Jarrell and Kentucky Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

240.    Plaintiff Jarrell and Kentucky Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

241.    Acting as reasonable consumers, Plaintiff Jarrell and Kentucky Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated

47

levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Jarrell and Kentucky Subclass members first purchasing Defendant's baby food products.

242. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Jarrell and members of the Kentucky Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 9
**(On Behalf of Plaintiff Lyles and the Maryland Subclass)**
**Violation of the Maryland Consumer Protection Act,**
**Md. Code, Comm. Law §§ 13-301, *et seq*. ("MCPA")**

243. Plaintiff Lyles repeats paragraphs 1–119 as if fully set forth herein.

244. The Maryland Consumer Protection Act, Md. Code, Comm. Law §§ 13-303, prohibits unfair, abusive, and deceptive practices, including: false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; representations that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; and a failure to state a material fact if the failure deceives or tends to deceive. Md. Code, Comm. Law §§ 13-301(1), (2)(i), (2)(iv), (3).

245. The MCPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices were in connection with the sale of consumer goods.

246.     Plaintiff Lyles and each member of the Maryland Subclass are persons within the meaning of Md. Code, Comm. Law § 13-408.

247.     Defendant's baby food products fall within MCPA because they are consumer goods.

248.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

249.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair, abusive, and deceptive acts or practices prohibited by the MCPA.

250.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

251.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Lyles and the Maryland Subclass.

252.     Defendant's aforementioned misrepresentations, omissions, and concealment are unfair and abusive because they offend public policy and cause substantial injury to consumers.

253.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Md. Code, Health-Gen. Code §§ 21-207, 21-208, 21-210, 21-247.

254.     Defendant intended that Plaintiff Lyles and Maryland Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material facts in purchasing Defendant's baby food products.

255.     Plaintiff Lyles and Maryland Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

256.     Acting as reasonable consumers, had Plaintiff Lyles and Maryland Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

257.     Plaintiff Lyles and Maryland Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

258.     Acting as reasonable consumers, Plaintiff Lyles and Maryland Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Lyles and Maryland Subclass members first purchasing Defendant's baby food products.

259.     As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Lyles and members of the Maryland Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food

had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 10**
**(On Behalf of Plaintiffs Musto, Nalley, and the Missouri Subclass)**
**Violation of the Missouri Merchandising Practices Act ("MMPA"),**
**Mo. Stat. § 407.010, *et seq*.**

260.    Plaintiffs Musto and Nalley repeat paragraphs 1–119 as if fully set forth herein.

261.    The MMPA, Mo. Stat. § 407.010, *et seq*., provides protection to consumers by mandating fair competition in commercial markets for goods and services.

262.    The MMPA prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Stat. § 407.020(1).

263.    The MMPA applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. Mo. Stat. § 407.010(7).

264.    Plaintiffs Musto, Nalley, and each member of the Missouri Subclass are "persons," as defined by Mo. Stat. § 407.010(5).

265.    Defendant's baby food products fall within the MMPA because they are tangible goods sold in trade or commerce. Mo. Stat. § 407.010(7).

266.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

51

267.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitutes deceptive and unconscionable acts or practices prohibited by the MMPA.

268.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

269.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiffs Musto, Nalley, and the Missouri Subclass.

270.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

271.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Mo. Stat. § 196.075(1).

272.     Defendant intended that Plaintiffs Musto, Nalley, and Missouri Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

273.     Plaintiffs Musto, Nalley, and Missouri Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

274.     Acting as reasonable consumers, had Plaintiffs Musto, Nalley, and Missouri Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

275. Plaintiffs Musto, Nalley, and Missouri Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

276. Acting as reasonable consumers, Plaintiffs Musto, Nalley, and Missouri Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs Musto, Nalley, and Missouri Subclass members first purchasing Defendant's baby food products.

277. As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiffs Musto, Nalley, and members of the Missouri Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## <u>COUNT 11</u>
**(On Behalf of Plaintiff Lau and the Nevada Subclass)**
**Violation of the Nevada Deceptive Trade Practices Act,**
**Nev. Rev. Stat. § 598.0915 ("NDTPA")**

278. Plaintiff Lau repeats paragraphs 1–119 as if fully set forth herein.

279. Nevada law prohibits knowingly making false representations as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods or services; representing that goods or services for sale are of a particular standard, quality, or grade, or that

such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style, or model; and knowingly making false representations in a transaction. Nev. Rev. Stat. § 598.0915(5), (7), (15).

280.    Nevada provides that victims of unlawful acts under Nev. Rev. Stat. § 598.0915 *et seq.* are entitled to bring an action under Nev. Rev. Stat. § 41.600(1), (2).

281.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

282.    Defendant's respective misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by Nevada law.

283.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

284.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Lau and the Nevada Subclass.

285.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

286.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Nev. Rev. Stat. §§ 585.300–585.350.

287.     Defendant intended that Plaintiff Lau and Nevada Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

288.     Plaintiff Lau and Nevada Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

289.     Acting as reasonable consumers, had Plaintiff Lau and Nevada Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

290.     Plaintiff Lau and Nevada Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

291.     Acting as reasonable consumers, Plaintiff Lau and Nevada Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Lau and Nevada Subclass members first purchasing Defendant's baby food products.

292.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Lau and members of the Nevada Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food

had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 12**
**(On Behalf of Plaintiff Hall and the New Hampshire Subclass)**
**Violation of New Hampshire Regulation of Business Practices for Consumer Protection,**
**N.H. Rev. Stat. §§ 358-A:1, *et seq*.**

293.    Plaintiff Hall repeats paragraphs 1–119 as if fully set forth herein.

294.    New Hampshire law prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, including but not limited to: representing that foods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model if they are of another, and advertising goods or services with intent not to sell them as advertised. N.H. Rev. Stat. §§ 358-A:2(V), (VII), (IX).

295.    New Hampshire Regulation of Business Practices for Consumer Protection applies to Defendant's acts or practices as described herein because Defendant's acts or practices occurred in the conduct of trade or commerce. N.H. Rev. Stat. § 358-A:1(II).

296.    Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

297.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the New Hampshire Regulation of Business Practices for Consumer Protection.

56

298.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

299.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Hall and New Hampshire Subclass members.

300.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

301.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.H. Rev. Stat. § 146:1, *et seq*.

302.    Defendant intended that Plaintiff and New Hampshire Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

303.    Plaintiff Hall and New Hampshire Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

304.    Acting as reasonable consumers, had Plaintiff Hall and New Hampshire Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

305.    Plaintiff Hall and New Hampshire Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

57

306.     Acting as reasonable consumers, Plaintiff Hall and New Hampshire Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Hall and New Hampshire Subclass members first purchasing Defendant's baby food products.

307.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Hall and members of the New Hampshire Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

<u>**COUNT 13**</u>
**(On Behalf of Plaintiff Daniels and the North Carolina Subclass)**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**
**N.C. Gen. Stat. § 75-1.1, *et seq*. ("NCUDTPA")**

308.     Plaintiff Daniels repeats paragraphs 1–119 as if fully set forth herein.

309.     N.C. Gen. Stat. § 75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

310.     Defendant's sales of Defendant's baby food products occurred in and affected commerce.

311.     In violation of the NCUDTPA, Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food

58

products, including the misrepresentations that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

312.    Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts or practices.

313.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

314.    Defendant's acts and practices in connection with the sale of Defendant's baby food products were unfair because they took advantage of the inability of Plaintiff Daniels and North Carolina Subclass members reasonably to protect their interests in ascertaining the Toxic Heavy Metal quantities of their products at the point of sale; Defendant knew that the price of their products (which are worthless given the excessive levels of Toxic Heavy Metals) were substantially in excess of the price at which they lawfully could be sold; and Defendant knew at the time of the transaction that Plaintiff Daniels and the North Carolina Subclass members were unable to receive a substantial benefit from their products.

315.    Defendant intended that Plaintiff Daniels and North Carolina Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

316.    Plaintiff Daniels and North Carolina Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they Defendant's baby food products.

317.    Acting as reasonable consumers, had Plaintiff Daniels and North Carolina Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

318.    Plaintiff Daniels and North Carolina Subclass members suffered injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

319.    Acting as reasonable consumers, Plaintiff Daniels and North Carolina Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Daniels and North Carolina Subclass members first purchasing Defendant's baby food products.

320.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Daniels and members of the North Carolina Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 14
**(On Behalf of Plaintiff Altuve and the North Dakota Subclass)**
**Violation of the North Dakota Unlawful Sales or Advertising Practices,**
**N.D.C.C. § 51-15, *et seq*.**

321.    Plaintiff Altuve repeats paragraphs 1–119 as if fully set forth herein.

322. The North Dakota Unlawful Sales or Advertising Practices ("North Dakota Act"), N.D.C.C. § 51-15, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

323. The North Dakota Act prohibits any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. N.D.C.C. § 51-15-02.

324. The North Dakota Act further prohibits the act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, and such an act is declared to be an unlawful practice. N.D.C.C. § 51-15-02.

325. The North Dakota Act applies to Defendant's acts as described herein because it applies to any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter. N.D.C.C. § 51-15-09.

326. Defendant is a "person," as defined by N.D.C.C. § 51-15-01.

327. Plaintiff Altuve and each member of the North Dakota Subclass are "persons," as defined by N.D.C.C. § 51-15-01.

328. Defendant's baby food products are "merchandise," as defined by N.D.C.C. § 51-15-01(3).

329. Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding Defendant's baby food products, including the

61

misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

330. Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the North Dakota Act.

331. Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

332. Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Altuve and the North Dakota Subclass.

333. Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

334. Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and N.D.C.C. § 19-02.1-02.

335. Defendant intended that Plaintiff Altuve and North Dakota Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

336. Plaintiff Altuve and North Dakota Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

337. Acting as reasonable consumers, had Plaintiff Altuve and North Dakota Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase Defendant's baby food products.

338.    Plaintiff Altuve and North Dakota Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

339.    Acting as reasonable consumers, Plaintiff Altuve and North Dakota Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Altuve and North Dakota Subclass members first purchasing Defendant's baby food products.

340.    As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Altuve and members of the North Dakota Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased those brands of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

### COUNT 15
**(On Behalf of Plaintiff Kovacs and the Tennessee Subclass)**
**Violation of the Tennessee Consumer Protection Act ("TCPA"),**
**Tenn. Stat. § 47-18-101, *et seq*.**

341.    Plaintiff Kovacs repeats paragraphs 1–119 as if fully set forth herein.

342.    The Tennessee Consumer Protection Act, Tenn. Stat. § 47-18-101, *et seq*., protects consumers from unfair and deceptive practices and acts.

343.    Plaintiff Kovacs is a consumer under Tenn. Stat. § 47-18-103(3).

344.     Defendant's baby food products are goods, and Defendant is a person who sold its products to Plaintiff Kovacs and Tennessee Subclass members in consumer transactions as those terms are defined under Tenn. Stat. § 47-18-103(8), (14), (20).

345.     Tenn. Stat. § 47-18-104(b)(5), (7), and (9) declare the following acts or practices unlawful:

a.     Representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.     Representing that goods are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

c.     Advertising goods with intent not to sell them as advertised.

346.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food was safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

347.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute deceptive and unconscionable acts or practices prohibited by the TCPA.

348.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

349.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Kovacs and the Tennessee Subclass.

350.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

351.    Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act, and Tenn. Stat. § 53-1-103.

352.    Defendant intended that Plaintiff Kovacs and Tennessee Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

353.    Plaintiff Kovacs and Tennessee Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

354.    Acting as reasonable consumers, had Plaintiff Kovacs and Tennessee Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

355.    Plaintiff Kovacs and Tennessee Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

356.    Acting as reasonable consumers, Plaintiff Kovacs and Tennessee Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals. Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff Kovacs and the Tennessee Subclass members first purchasing Defendant's baby food products.

357.     As a direct and proximate result of Defendant's deceptive and unconscionable acts or practices, Plaintiff Kovacs and members of the Tennessee Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

**COUNT 16**
**(On Behalf of Plaintiff Okolo and the Virginia Subclass)**
**Violation of the Virginia Consumer Protection Act of 1977 ("VCPA"),**
**Va. Code § 59.1-196, *et seq*.**

358.     Plaintiff Okolo repeats paragraphs 1–119 as if fully set forth herein.

359.     The Virginia Consumer Protection Act of 1977, Va. Code § 59.1-200, proclaims that the following are fraudulent acts or practices and are unlawful: misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; advertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are as such; using deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code § 59.1-200(A)(5), (6), (7), (14).

360.     Plaintiff Okolo and each member of the Virginia Subclass are consumers under the VCPA.

361.     Defendant's baby food products are "goods" under the VCPA that were sold to Plaintiff Okolo and the Virginia Subclass members in consumer transactions.

362.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that

66

its brand of baby food was safe for human consumption and the omission that it brand of baby food contained unsafe levels of Toxic Heavy Metals.

363.    Defendant's   misrepresentations,   omissions,   and   concealment   regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the VCPA.

364.    Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

365.    Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Okolo and Virginia Subclass members.

366.    Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

367.    Defendant intended that Plaintiff Okolo and Virginia Subclass members rely on its aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

368.    Plaintiff Okolo and Virginia Subclass members reasonably relied on Defendant's misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

369.    Acting as reasonable consumers, had Plaintiff Okolo and Virginia Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

370.    Plaintiff Okolo and Virginia Subclass members suffered loss and injuries in fact— *i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that

these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

371.    Acting as reasonable consumers, Plaintiff Okolo and Virginia Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiff and Virginia Subclass members first purchasing Defendant's baby food products.

372.    As a direct and proximate result of Defendant's deceptive acts or practices, Plaintiff Okolo and Virginia Subclass members suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

373.    Under Va. Code § 59.1-204(A), (B), Plaintiff Okolo and Virginia Subclass members seek actual damages, or $500, whichever is greater, and treble their actual damages, or $1,000 for Defendant's willful violations of the VCPA. In addition, Plaintiff Okolo and Virginia Subclass members seek reasonable attorneys' fees and costs. Plaintiff Okolo and Virginia Subclass members also seek to enjoin Defendant from further violating the VCPA under Va. Code § 59.1-205.

### COUNT 17
**(On Behalf of Plaintiff Gillens and the Washington D.C. Subclass)**
**Violation of Consumer Protection Procedures Act,**
**D.C. Code § 28-3901, *et seq*. ("CPPA")**

374.    Plaintiff Gillens repeats paragraphs 1–119 as if fully set forth herein.

68

375.     The CPPA states that it is unfair and deceptive to represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; misrepresent as to a material fact which has a tendency to mislead; fail to state a material fact if such failure tends to mislead. D.C. Code §§ 28-3904(a), (d), (e), (f).

376.     Plaintiff Gillens and each member of the Washington D.C. Subclass are consumers. D.C. Code § 28-3901(2).

377.     Defendant's baby food products fall within the CPPA because they meet the definition of "goods and services." D.C. Code § 28-3901(7).

378.     Defendant made false and fraudulent statements, and misrepresented, concealed, and omitted material facts regarding its brand of baby food, including the misrepresentation that its brand of baby food were safe for human consumption and the omission that its brand of baby food contained unsafe levels of Toxic Heavy Metals.

379.     Defendant's misrepresentations, omissions, and concealment regarding Defendant's baby food products constitute unfair and deceptive acts prohibited under the CPPA.

380.     Defendant's aforementioned misrepresentations, omissions, and concealment possess the tendency or capacity to mislead and create the likelihood of consumer confusion.

381.     Defendant's aforementioned misrepresentations, omissions, and concealment were used or employed in the conduct of trade or commerce, namely, the marketing, sale, and distribution of Defendant's baby food products to Plaintiff Gillens and the Washington D.C. Subclass.

69

382.     Defendant's aforementioned misrepresentations, omissions, and concealment are unconscionable because they offend public policy and/or cause substantial injury to consumers.

383.     Defendant's aforementioned conduct is deceptive and unlawful because it violated section 343(a)(i) of the Food, Drug, and Cosmetic Act.

384.     Defendant intended that Plaintiff Gillens and Washington D.C. Subclass members rely on their respective aforementioned false statements, misrepresentations, omissions, and concealment of material fact in purchasing Defendant's baby food products.

385.     Plaintiff Gillens and Washington D.C. Subclass members reasonably relied on Defendant's respective misrepresentations, omissions, and concealment when they purchased Defendant's baby food products.

386.     Acting as reasonable consumers, had Plaintiff Gillens and Washington D.C. Subclass members been aware of the true facts regarding the presence of Toxic Heavy Metals in Defendant's baby food products, they would have declined to purchase these products.

387.     Plaintiff Gillens and Washington D.C. Subclass members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

388.     Acting as reasonable consumers, Plaintiff Gillens and Washington D.C. Subclass members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that those brands of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible

70

without Plaintiff Gillens and Washington D.C. Subclass members first purchasing Defendant's baby food products.

389.    As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Gillens and members of the Washington D.C. Subclass suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 18
### (On Behalf of All Plaintiffs and the Class and Each State Subclass)
### Fraudulent Concealment

390.    Plaintiffs repeat paragraphs 1–119 as if fully set forth herein.

391.    As alleged above, the presence of elevated levels of Toxic Heavy Metals in baby food is a material fact to consumers.

392.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, such as Plaintiffs and members of the Class.

393.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

394.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding Defendant's baby food products they would have declined to purchase those brands of baby food.

395.    Plaintiffs and Class members suffered injuries in fact—*i.e.*, the loss of the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

396.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

397.    As a direct and proximate result of Defendant's fraudulent concealment, Plaintiffs and members of the Class suffered damages by purchasing Defendant's baby food products because they would not have purchased its brand of baby food had they known the truth, and they received a product that was worthless because it contains unsafe levels of Toxic Heavy Metals.

## COUNT 19
### (On Behalf of All Plaintiffs and the Class and Each State Subclass)
### Unjust Enrichment

398.    Plaintiffs repeat paragraphs 1–119 as if fully set forth herein.

399.    Defendant knew that the presence of elevated levels of Toxic Heavy Metals in Defendant's baby food products was a material fact to consumers, including Plaintiffs and Class members.

400.    Because Defendant is responsible for, and control, the manufacturing, marketing, distribution, and sale of Defendant's baby food products, Defendant knew and intended that its omissions and concealment of the presence of elevated levels of Toxic Heavy Metals in its brands

of baby food would mislead Plaintiffs and Class members, and induce them to buy products that they would otherwise not have been willing to purchase.

401.    Acting as reasonable consumers, had Plaintiffs and Class members been aware of the true facts regarding the Defendant's baby food products, they would have declined to purchase those brands of baby food.

402.    Acting as reasonable consumers, Plaintiffs and Class members could not have avoided the injuries suffered by purchasing Defendant's baby food products because they did not have any reason to suspect that its brand of baby food contained elevated levels of Toxic Heavy Metals.  Moreover, the detection of Toxic Heavy Metals in food requires rigorous and specialized scientific testing that goes well beyond the level of inquiry a reasonable consumer would make into the issue, and, in any event, such testing was not possible without Plaintiffs and Class members first purchasing Defendant's baby food products.

403.    As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and members of the Class conferred a benefit on Defendant—*i.e.*, the money that they paid for Defendant's baby food products under the belief that these products were safe for human consumption and did not contain unsafe levels of Toxic Heavy Metals.

404.    Defendant acquired and retained money belonging to Plaintiffs and the Class as a result of their wrongful conduct—*i.e.*, misrepresenting that Defendant's baby food products were safe for human consumption, and concealing the fact that those brands of baby food contained unsafe levels of Toxic Heavy Metals. Defendant profited at the expense of Plaintiffs and Class members in connection with each individual sale of Defendant's baby food products because Plaintiffs and Class members paid money for products that were worthless due to the fact that they are not safe for human consumption.

405.     Defendant has unjustly received and retained a benefit at the expense of Plaintiffs and the Class because Defendant unlawfully acquired its profits for worthless (and unsafe) baby food products while appreciating and knowing that Defendant's baby food products were unsafe for human consumption, contrary to their misrepresentations and omissions.

406.     Defendant's retention of that benefit violates the fundamental principles of justice, equity, and good conscience because Defendant misled Plaintiffs and the Class into falsely believing that Defendant's baby food products were safe and did not contain unsafe levels of Toxic Heavy Metals in order to unjustly receive and retain a benefit.

407.     Under the principles of equity, Defendant should not be allowed to keep the money rightfully belonging to Plaintiffs and the members of the Class because Defendant have unjustly received it as a result of Defendant's unlawful actions described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class and Subclasses, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class and/or Subclasses defined herein;

B.     Designating Plaintiffs as representatives of the Class and/or the respective Subclasses, and designating undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Classes and/or Subclasses, and against Defendant;

D.     Awarding Plaintiffs and Class and/or Subclass members all relief to which they are entitled, including awards for their actual damages, statutory damages, treble damages, enhanced damages, and punitive damages for Defendant's willful and intentional conduct;

E.     Ordering equitable relief, including restitution, disgorgement of any of Defendant's ill-gotten gains, imposing a constructive trust in favor of Plaintiffs and the Class and/or Subclass members, and awarding those amounts to Plaintiffs and the Class and/or Subclass members;

F. Granting injunctive relief, including but not limited to, an order: (1) requiring Defendant to cease its unlawful and deceptive practices; (2) requiring Defendant to implement and maintain adequate manufacturing procedures, final product testing procedures, and ingredient sourcing and inspection practices to ensure their baby food does not contain unsafe and unacceptable levels of Toxic Heavy Metals; and (3) requiring clear and prominent disclosure requirements on Defendant's product packaging regarding the levels of Toxic Heavy Metals in their finished products;

G. Awarding Plaintiffs and the Class and/or Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and

H. Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

By: s/Javier Merino
Javier Merino
*jmerino@dannlaw.com*
**Dann Law**
372 Kinderkamack Road, Suite 5
Westwood, New Jersey 07675
(201) 355-3440 telephone

Thomas A. Zimmerman, Jr.
(*pro hac vice* anticipated)
*tom@attorneyzim.com*
Sharon A. Harris
(*pro hac vice* anticipated)
*sharon@attorneyzim.com*
Matthew C. De Re
(*pro hac vice* anticipated)
*matt@attorneyzim.com*
Jeffrey D. Blake
(*pro hac vice* anticipated)
*jeff@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602

(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com

Counsel for Plaintiffs and the putative Classes