FILED
CLERK
1/23/2026 11:43 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: | **Docket#** 21-cv-00678(NRM)(AYS) |
| HAIN CELESTIAL HEAVY METALS BABY FOOD LITIGATION | U.S. Courthouse<br>Central Islip, New York |
| | January 8, 2026<br>2:08 p.m. |

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE MOTION
BEFORE THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**


**For the Plaintiff:**

**Michael P. Canty, Esq.**
**Danielle Izzo, Esq.**
**Thomas G. Hoffman, Jr.**
Labaton Keller Sucharow LLP
140 Broadway
New York, NY 10005

**For Defendants:**

**Alexander Smith, Esq.**
Jenner & Block LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071

**Transcription Service:**

**Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: ...78, *In re Hain Celestial Heavy Metals Baby Food Litigation*.

Please state your appearances for the record.

MS. IZZO: Good afternoon, your Honor. Danielle Izzo; Mazzeo Labaton Keller Sucharow, for the plaintiffs.

THE COURT: Good afternoon.

MR. HOFFMAN: Good afternoon. Thomas G. Hoffman, Jr., also of the Labaton firm. Your Honor, I'm here in a supervisory capacity only today and to support my colleague, Ms. Izzo. Thank you.

THE COURT: Very good. Good afternoon. Back there on this case or no?

UNIDENTIFIED SPEAKER: Good afternoon. I'm also from the Labaton firm but I'm not (inaudible).

THE COURT: Okay. You can come up and sit with them if you want. It's fine with me.

UNIDENTIFIED SPEAKER: Thank you.

THE COURT: I can't imagine that somebody not affiliated would be at all interested in this.

Okay. Who do we have on the phone?

MR. CANTY: Good afternoon, your Honor.

THE COURT: Okay. I'm sorry, wait. We've got to get the volume right, here. It's breaking my ears for the moment so hold on. It's really loud. Hello? Let me

hear your name again.

MR. CANTY: Sure. Good afternoon, your Honor. This is Michael Canty from Labaton Keller Sucharow, again, just to listen in on the hearing.

THE COURT: Oh, that's one of you. Okay.

MR. CANTY: Yes, your Honor.

THE COURT: You don't get to speak. Who else is on the phone?

MR. CANTY: Yeah, correct.

MR. SMITH: And good afternoon, your Honor. This is Alex Smith from Jenner & Block on behalf of Hain Celestial. And I should say I very much appreciate you allowing me to appear over the phone under the circumstances.

THE COURT: So I guess you had a flight. Where were you flying in from?

MR. SMITH: Los Angeles.

THE COURT: Okay. All right. Well, I can hear you, so that's good. And I believe you when you say you tried to get here and that your plane got stuck, so it's better that we go forward. It's not ideal, but it's still better to go forward. So this is --

MR. SMITH: Agreed, your Honor.

THE COURT: -- this is a hearing on a discovery dispute. I had two letters. The first letter came from

the plaintiff's law firm. And just reading that letter alone, it seemed that there was agreement and according to what the plaintiff said, there was agreement and then the defendant said no, we're not going along with that. So clearly, we don't have agreement on what has even happened so far.

So let me hear from defense counsel. And I'd like you to explain to me what was agreed to, what the conversations were, and I'll let you have the floor for a moment.

MR. SMITH: Thank you, your Honor. So as we outline in the letter, we reviewed quite a few documents using both search terms and documents pulled from other sources. When we completed that process, we told plaintiffs that we had completed our production and the plaintiffs asked us to review documents that hit on a number of other terms as well as to manually review all documents that included the term arsenic.

THE COURT: Hold on for one --

MR. SMITH: We told the plaintiff --

THE COURT: Hold on, hold on for one moment. So when you said you reviewed documents, let's start at the beginning. Let's start about when we say that you said that you had reviewed 131,000 documents and produced about 21,000, right?

MR. SMITH: Correct.

THE COURT: So what did you do to cull those documents?

MR. SMITH: So we did three things, your Honor. One is that we pulled some documents from the share drives and we reviewed those. So for instance, you know, and those share drives included things like labeling, test results, et cetera. So if, you know, there were labels from the products at issue we produce them. If there were test results for the products at issue we produced them.

We also looked at documents that had been produced in a related multi-district litigation. We did not use search terms on these documents. We instead had reviewers look at them manually. And it turned out that about 10,000 and change of those documents ended up being responsive and relevant to the issues in this case.

THE COURT: How many did you manually -- how many of those MDL documents did you manually review?

MR. SMITH: About 29,000.

THE COURT: 29,000?

MR. SMITH: Right.

THE COURT: And out of those you found about 10,000 were responsive in this case?

MR. SMITH: That's correct.

THE COURT: Okay. Go on.

MR. SMITH: Yes. We then reviewed about 100,000 documents that we produced that we culled using additional search terms. And we used these terms because we understood that the documents produced in the MDL and the documents from our share drives were not going to capture the entire universe of potentially relevant documents. So we reviewed --

THE COURT: And you -- see, I'm a big interrupter. That's a problem with you not being here. You said you looked at search terms. Were those search terms that you had used yourself? Had you gone over the plaintiffs with them and what were they?

MR. SMITH: Sure. So the search terms are outlined in paragraph 2 of our letter.

THE COURT: Okay.

MR. SMITH: Or on page 2 of our letter, excuse me. And they included --

THE COURT: Got it.

MR. SMITH: -- arsenic and then -- yeah.

THE COURT: Yes.

MR. SMITH: So those are the search terms that we ran. We disclosed those search terms to plaintiff and we said that we were going to start with those terms because we thought that they were appropriately tailored.

And sure enough, they captured I think basically all the documents that we think would be relevant in this type of case. They also captured a ton of documents that were not relevant to this case either because they did not have (indiscernible) issues in this case, dealt with products that are not at issue in this case, or for some other reason.

THE COURT: What would you say numbers wise that that review produced in terms of producible or not within the scope of this case out of those 100,000?

MR. SMITH: I would say that, I would say it was about 10, 11,000 documents.

THE COURT: So still only about 10 to 11,000 out of 100,000 using those search terms, right?

MR. SMITH: Correct, your Honor.

THE COURT: Okay. And just basically describe to me a document that you would find that you'd say oh gee, these search terms were wildly broad or like what would it give you that you would say this is not producible. Something general.

MR. SMITH: Sure. So it's all a few different dockets, your Honor. So we would find some documents that were like marketing decks for these products, like a failed deck that Hain Celestial might give to a retailer that talked about the products generally but really had

nothing to do with the presence of heavy metals in the products or the safety of the products or anything like that.

We would find documents that related to products that were not at issue in this case. For example, there were a number of documents that we saw about the presence of arsenic in products like Rice Dream rice milk, some of Hain Celestial's personal care products, things like that.

THE COURT: And this case --

MR. SMITH: And there was just --

THE COURT: -- this case is just --

MR. SMITH: Go ahead.

THE COURT: This case is just baby food you find in a jar or is it broader than that?

MR. SMITH: It is like baby food you find in a jar. So it's baby food in a jar, baby food in a pouch.

THE COURT: Okay.

MR. SMITH: Baby food you find in a cereal box. I'll also note that now that Judge Morrison has limited the case to arsenic --

THE COURT: Right.

MR. SMITH: -- really the only product that we're aware that it had elevated levels of arsenic is rice cereal which is a product that Hain Celestial

formerly produced, no longer produces.

THE COURT: Okay.

MR. SMITH: But we did not limit our production to rice cereal. We, you know, tailored it to the baby food products that plaintiff put at issue in their complaint even though we believed that almost none of them have any sort of an arsenic issue.

THE COURT: But you did do a search with these terms and those terms included arsenic. And did they also include the terms that I think Judge Morrison referred to certain terms that were not puffery, pure nurturing, those terms, superior ingredients?

MR. SMITH: Yes. So you'll see that search two was Earth's Best, you know, blah, blah, blah, and pure or made with superior ingredients, or non-GMO, or GMO, or genetically engineered, et cetera.

THE COURT: Okay.

MR. SMITH: And those are all the search terms that plaintiffs have put in issue and that Judge Morrison were not puffery.

THE COURT: Okay. All right. I'll let you go on.

MR. SMITH: Yeah. So we went through this process and we reviewed roughly 100,000 documents. Only 10,000 of the documents ended up being responsive. And

we went through this process at great expense and we confirmed to plaintiff in I believe September 2025 that we had completed our review of documents responsive to these terms. And plaintiffs asked us whether we would be willing to run additional terms. Those are the terms that are outlined in their letter, at least some of them are. They hit on about 480,000 documents which is something that we would not ever agree to review just linearly.

THE COURT: So I mean according to you, after this production, the plaintiffs said to you, and I will absolutely give the plaintiffs an opportunity to speak, as far as you're concerned, the plaintiffs asked you to run these additional terms and those are the ones that are in the plaintiff's letter, correct?

MR. SMITH: That's correct, that's correct.

THE COURT: And that's the ones on page 3, just so we're on literally the same page? Yes. Toxins or toxic pure. How did you get to the 480,000? What happened?

MR. SMITH: Sure. So these are not -- this is not a full list of the documents --

THE COURT: Okay, okay.

MR. SMITH: -- of the terms.

THE COURT: Okay. Go it.

MR. SMITH: We took the terms that they proposed and we took them to our e-discovery vendor and we asked them to estimate the, or calculate the number of documents that hit on these terms and our e-discovery vendor informed us that the total volume of documents hitting on these terms was approximately 480,000.

THE COURT: And if that were the next step if you had agreed to those terms, the next step one way or another would be say okay, thanks for the 480,000. Now would you have to look at them the same way that you looked at the previous 100,000?

MR. SMITH: Yes, but I want to clarify one point on that, your Honor --

THE COURT: Okay, okay.

MR. SMITH: -- which is that the parties agreed to a technology assistance assisted review protocol in this case --

THE COURT: Right.

MR. SMITH: -- that was designed to assess sort of, you know, whether documents were likely to be responsive. And there's an algorithm working in the background that can give us sort of a prediction of how likely it is that future documents are likely to be responsive. And they can tell us that there's a point in the review where no document, where you know, the

remaining documents are so unlikely to be responsive that it makes sense to cut off the review at that point.

THE COURT: Understood. And that, everyone agreed to that? There's no question about whether people agreed to that?

MR. SMITH: Everyone agreed to that, your Honor.

THE COURT: Right. Okay.

MR. SMITH: Yes. We've assigned TAR protocol between the parties.

THE COURT: Okay. So using that protocol with the terms that the plaintiff asked you to run yielded 480,000. Is that right?

MR. SMITH: So the raw hit was 480,000.

THE COURT: Right.

MR. SMITH: Our e-discovery vendor estimated that it would be some number, tens of thousands of documents that we would review before they got to the cutoff score, but again, we wouldn't know whether we'd get to the cutoff score until we got to it.

THE COURT: Okay. So you'd have to review a certain number before you get to that cutoff number. So it's not 480,000 --

MR. SMITH: That's correct.

THE COURT: -- it's whatever that is. I don't

know what that is.

MR. SMITH: Right, right. Our best estimate was that it was in the tens of thousands.

THE COURT: I'm sorry, I didn't hear what you said. What?

MR. SMITH: Our best estimate was that it would be in the tens of thousands of documents that we would need to review manually.

THE COURT: Okay.

MR. SMITH: And then after we had sort of gotten through those documents, you know, there was also family member attachments, things like that that we would need to review not because we thought they'd likely be responsive, but just to make sure we weren't producing something privileged or that there wasn't some other issue with documents that would be swept up because we're producing full families in those cases.

THE COURT: Right. So just to be clear, it's not a manual review of 480,000, it's a manual review of, I don't know, 10, 20,000 before you get to the point where it could be sort of mathematically determined you're not going to get anything further. Is that fair to say?

MR. SMITH: I would guess that it's probably closer to 30, 40, 50,000, but yes, conceptually that's

right, your Honor.

THE COURT: Okay. And you had already been through that process in some fashion with the first 100,000.

MR. SMITH: That's correct, your Honor.

THE COURT: Similar process? Okay.

MR. SMITH: Similar process.

THE COURT: Okay. All right. I'll let you go on.

MR. SMITH: Yes. So you know, we told plaintiffs that we would not review these documents manually, that we would consider reviewing them as part of the TAR workflow. And then we did some sort of preliminary test, or you know, discussions with our e-discovery vendor and with our client. And we came to a conclusion that given the number of documents that we'd already produced, given the number of documents, given the amount of money that we spent, and given, you know, the fact that we thought that everything that is relevant in this sort of case has already been produced, we didn't think it makes sense to go forward with the review that plaintiff's proposed even using TAR to cull the population.

THE COURT: Right. So that's basically your proportionality argument at that point that the further

expense --

MR. SMITH: Yes. And again, we agreed -- yeah, sorry, your Honor.

THE COURT: I'm sorry, go ahead. No, no, you go ahead, you go ahead.

MR. SMITH: So we agreed to look into whether we could use TAR as part of this workflow and to get started with the process of assessing whether TAR could meaningfully limit the number of documents in a way that was proportional to the case. And we did that. And we ultimately concluded, as we told plaintiff, that it was not proportional to the needs of the case and that given the amount of, you know, number of documents we produced, number of documents we reviewed, the amount of money we spent, that we didn't think that further review was merited given the breadth of the search terms that plaintiffs proposed.

THE COURT: Okay. So the basic argument is that if you were to add these additional terms, it's going to go into the territory of disproportional to the needs of the case given what you've already given to them. Is that right?

MR. SMITH: That's correct, your Honor.

THE COURT: Okay. All right.

MR. SMITH: The other thing I'd add just on

that point is that, you know, when plaintiffs approached us with these terms, I think the message that we got from them was very much, you know, we want to know, we don't know what we don't know so we think it's important to have a comprehensive range of terms.

I mean in many other cases the message from the plaintiffs will be we've seen this in your document production or we're interested in this issue. Here's a relatively narrow, you know, search term or set of search terms that we want to use to get around a discrete issue that we've seen in your production. Or we don't think that these documents have appeared in your production even though we expected them to. Here's a set of terms, get to that.

And that really wasn't the message here. The message was we don't know what we don't know, so we'd like you to run a broad set of terms.

THE COURT: Okay. And the terms that you use which are on page 2 of your letter are terms that you use to search the universe of your documents, or reasonable universe of your documents?

MR. SMITH: That's correct, your Honor.

THE COURT: Okay.

MR. SMITH: We pulled documents from nine or ten custodians and we ran those terms across them.

THE COURT: Okay. And I don't think, and I'll ask the plaintiff that quick question, I don't think there's an issue as to the universe of documents. The issue is the search terms. Is that right?

MR. SMITH: I think that's right.

MS. IZZO: Yes, that's correct.

THE COURT: Okay. So that's, you know, easily said, right? It's the question of the search terms and it's the question of proportionality. And there is no question that the defendants have produced a lot in this case but, you know, it's not just the number of documents. And I get plaintiff saying we don't know what we don't know, but if we just go with we don't know what we don't know, then there's no end. Right?

So let me give plaintiffs a chance to talk to me a bit because from the plaintiff's point of view, there was clearly an agreement here and that's where I think the parties really part company. So let me give the plaintiff an opportunity. So I just want to -- you can stay seated. Just make sure you speak into the mic because I want to make sure that the person on the phone can hear you.

MS. IZZO: Absolutely. Thank you. And again, this is Danielle Izzo; Mazzeo Labaton Keller Sucharow. And I'll just confirm that counsel can hear me on the

phone before I continue.

THE COURT: Thank you.

MR. SMITH: I can. Thank you.

THE COURT: I was about to say that. Go ahead.

MS. IZZO: So your Honor, you're exactly right. There's clearly a disconnect here. And I think that disconnect you'll find is with the search terms and the characterization of what stage the parties were at in negotiating the search terms.

Counsel has presented an interesting interpretation of the situation where this is an additional set of search terms on top of Hain already fulfilling search term obligations, but that's simply not the case. He wrote us a letter over the summer of 2025 saying we intend to run these search terms but please let us know how we can continue negotiating search terms for this case.

THE COURT: And the ones they intended to run are the ones that are on page 2 of their letter?

MS. IZZO: That's correct, your Honor.

THE COURT: Okay. So that's where we are. They send you a letter saying hey, these are the ones that we think we're going to run and you say what?

MS. IZZO: We say back we will have a counterproposal. I don't want to say our own list

because there were some places where we could certainly agree.

THE COURT: Okay.

MS. IZZO: But we will have a counterproposal because as in all ESI processes, cooperation is key. We're going to back and forth and narrow this to a set of terms that everybody can agree with and live with.

THE COURT: Right.

MS. IZZO: And we did that. So we provided our counter terms. So I think the disconnect is we never viewed this as some additional discovery. This is the initial search term negotiation that you have at the beginning and the start of any discovery.

THE COURT: So you give them these --I'm going to call them additional but I hear what you're saying that it is different.

MS. IZZO: Our proposed search terms.

THE COURT: You give them your terms and that's when?

MS. IZZO: We did that in, I believe their letter was August of 2025 and we kicked this process off in early September of 2025. I think the Labor Day holiday was right in between there.

THE COURT: Oh, lucky you. Okay. So you send them over and then what happens?

MS. IZZO: So we continue now for weeks going back and forth via email and across the meet and confers about the terms themselves. And Hain, as is typical in this process, offered to run a hit report. So they ran the search terms that we had proposed. And I'll say we had proposed loosely because by this point the parties had gone back and forth and expressed the desire to add some limiters or a potential tweak and we were working cooperatively. So I'll say we reached some kind of cooperative proposal that they ran across their system.

THE COURT: So they agreed, they said let's take a look?

MS. IZZO: Yes.

THE COURT: Okay.

MS. IZZO: They run the hit report and this is the hit report that returns the 480,000 documents.

THE COURT: Got it.

MS. IZZO: We say we would like to move forward. There was talk about the TAR protocol and the review process to get through those documents. And as is typical, as counsel represented, we did get to a TAR protocol, it's signed by all parties. We did flag that we wanted to treat two search terms differently and I'll get to that in a second. That's what we were referring to before as manual review. That's kind of like a

secondary issue that I'll get to. But we agreed to a TAR protocol. And I have an email September 29th from Alexander Smith that concludes with, "We will get started with the TAR review in the meantime in the interest of moving things forward."

THE COURT: Meaning to you what?

MS. IZZO: Meaning to us this is regarding the hits associated with these terms. So there --

THE COURT: With all of your terms that you had proposed?

MS. IZZO: Correct.

THE COURT: Okay.

MS. IZZO: Well, the terms that we had proposed and then reached some kind of agreement on after some back and forth.

THE COURT: Okay. So it narrowed a bit.

MS. IZZO: So I'll refer to it as the universe of $480,000 because this is on a chain of emails in response to the hit report.

They conclude with, "We will get started on the TAR review in the meantime in the interest of moving things forward." The "in the meantime" is in reference to that continued manual review discussion that the parties were having as to two terms, but we were very encouraged. Hain had kind of set aside our manual review

issue on the two search terms but was representing that it would undertake review of the 480,000 documents.

THE COURT: And what's your interpretation of what he meant by we will get started on the TAR review?

MS. IZZO: The TAR review would be using our TAR protocol and review process on reviewing the universe of 480,000 documents less the documents hit on by the two search strings where the parties were still negotiating whether to use manual review or TAR.

THE COURT: Right. And TAR is just computer learning finding documents.

MS. IZZO: Correct.

THE COURT: Okay.

MS. IZZO: So no issue there.

THE COURT: Right.

MS. IZZO: We were actually very encouraged that the process was going to move on two tracks to keep things moving expeditiously.

THE COURT: Okay. Got it.

MS. IZZO: This all comes on the heels of -- and I just want to explain. Counsel correctly said there were 21,000 documents produced in three buckets but those buckets actually don't fulfill the discovery obligations in the case at all.

The first bucket is from a related MDL. That's

what their representation is. The MDL is not related at all. And I was actually a little bit surprised to see it referred to as related. So there's an MDL against Hain for baby food but for personal and physical injury claims.

THE COURT: That's against Hain and other baby food manufacturers?

MS. IZZO: Yes.

THE COURT: Does it have to do with arsenic?

MS. IZZO: I'm actually not sure, your Honor. I think it stems from the subcommittee report on heavy metal so I think arsenic is an element. I don't know if it survives the motion to dismiss in that case.

THE COURT: It may be broader in that case.

MS. IZZO: I think it absolutely is broader.

THE COURT: Right.

MS. IZZO: And it's also riddled with individualized issues given the physical injury. So --

THE COURT: Right. This is an advertising type of claim --

MS. IZZO: Correct.

THE COURT: -- and that's the injury, personal injury claim.

MS. IZZO: Yes.

THE COURT: But what is in the baby food there

and here is alleged to be heavy metals, arsenic, you know, that whole list, right?

MS. IZZO: Yeah. So if you were to draw a Venn diagram of the MDL and this case, there certainly is a very little bit of overlap. The thing that's interesting here is very early on in this case there was talk at a hearing on whether this case should be consolidated into the MDL and Hain actually argued against it saying they have nothing to do with one another because the advertising claims are so different than the personal injury claims.

THE COURT: Right.

MS. IZZO: And the Court agreed.

MS. IZZO: Well, they're different in terms of what the plaintiff's claims injuries are certainly. And I think in our part even those cases aren't part of these consolidated cases. So I agree with you there, definitely different. But in terms of what Hain, as party to the MDL or here, they're similar because the question is what does Hain know about its ingredients.

MS. IZZO: Absolutely.

THE COURT: Right?

MS. IZZO: So for that, very encouraging to get documents from there.

THE COURT: Right.

MS. IZZO: But that simply cannot be the full universe of the documents that we have to rely on in this case because there's a whole key aspect that we have damages.

THE COURT: I agree that it never would be. It is a good shortcut because I think there is overlap not in terms of injury, not in terms of the plaintiff's types of claims. But there's got to be overlap. And yes, absolutely a good first step but one case is never -- just because you did something in one case, it doesn't mean you fulfilled your obligation in other case. But it could have given you a lot of documents to start with. So I'll let you go on.

MS. IZZO: Agreed. So as a starting point, certainly a starting point but not the search term and ESI process that would --

THE COURT: For this case.

MS. IZZO: -- usually take place in a case.

THE COURT: Yes.

MS. IZZO: Same for the non-custodial documents. Again, certainly a first step in the process routinely done in cases but that's not where the process ends.

And then as to the search terms that Hain did run --

THE COURT: Right.

MS. IZZO: -- again, those were Hain's unilaterally selected terms. We don't really know how Hain cherry picked those terms and we certainly don't know what their -- at that time they were running TAR before the parties had entered into a TAR review protocol. So I actually am a little bit in the dark on the relevance parameters there.

THE COURT: Well, let's stop there for a moment because you're saying you don't know how those terms were run through the TAR protocol. Let me stop there and ask defense counsel were those terms run through the TAR protocol in this case, they've agreed to in this case?

MR. SMITH: So are we talking about the terms that we -- the search terms that we ran or --

THE COURT: Yes.

MR. SMITH: -- the documents from the MDL at this point?

THE COURT: No, no, the search terms that you ran because I think that gets to the heart of discovery in this case, right? Because those search terms, I'm looking at those search terms and I think they're good search terms for getting relevant documents in this case. This case is about arsenic, this case is about Earth's Best, this case is about Superior. All those things are

good search terms. But counsel just raised a question as to how you ran them and that you might have run them in a way different to the TAR protocol that you agreed upon in this case. So that's my question to you.

MR. SMITH: So the answer to that question, your Honor, is that we ran those terms using the TAR protocol that we ultimately agreed to. Our review of those documents commenced before we finalized that TAR review protocol, but we ultimately reviewed that population of documents using the steps outlined in our TAR review protocol.

THE COURT: Okay.

MR. SMITH: We got to a cutoff point. We reviewed a validation sample at the end of the process. All of that.

THE COURT: Okay. I just wanted to get that out there before we go on.

MR. SMITH: Yes.

THE COURT: Okay. So on.

MS. IZZO: So agree with you, your Honor. The terms that Hain cited in its letter, many of them overlap with the terms that were in the back and forth that the parties had over the next few weeks. But there's a few glaring terms that are missing that are key to this case.

THE COURT: Let's talk about those.

MS. IZZO: So I have the term -- we didn't attach the terms here because we were instructed not to provide exhibits, but I'm happy to provide you with a copy of the terms if it would be helpful.

THE COURT: I think that would be great. I think that would be great. Why don't you bring it up?

And counsel on the phone, you know what she's talking about, right?

MR. SMITH: I can pull it up, yes.

THE COURT: I'm just going to sort of describe for you without reading the document.

MS. IZZO: Your Honor, I put two little asterisk stars next to two examples of terms that we captured documents that are completely missing from the terms --

THE COURT: Do you need this for your argument? I don't want to take it away from you.

MS. IZZO: No, you can hold onto it.

THE COURT: Are you sure?

MS. IZZO: I just felt leaving you with the two asterisks may --

THE COURT: No, that's fine. That's fine. I was going to say I won't look at your notes. Your marginalia is not of interest to me.

So what counsel just gave me just for counsel

on the phone, it's about -- I mean it's --

MS. IZZO: It's 34 search strings, your Honor.

THE COURT: There you go. Thank you. 34 search terms. So let me ask counsel on the phone you know what she's talking about, right?

MR. SMITH: Yes. It starts with (indiscernible) metal.

THE COURT: Correct. Now, you got these --

MR. SMITH: Yeah, I have that document in front of me.

THE COURT: Let me ask counsel here. You provided these to them and what happens then?

MS. IZZO: So this is what kicked off the meet and confer process which was a few weeks long. It took place over the phone, via email, over Zoom. We'd go back and forth on the terms. And you'll see the version that you're looking at contains limiters and those limiters were born out of the parties' negotiations, things like adding a limiter for Earth's Best to close the universe of the products that are at issue in this case, not every Hain produced product under the sun.

THE COURT: And this is a product of back and forth. You give them a list, they give it back to you. And then what's the date of this when, you know, you say you agree to it? So end of September, the 29th? Is

that --

MS. IZZO: The date would be early September.

THE COURT: Okay.

MS. IZZO: Early to mid-September 2025. And I apologize because I told you you could keep the copy and I wasn't anticipating memorizing the --

THE COURT: You don't have on?

MS. IZZO: He does, he does, but I didn't want to (indiscernible) --

MR. SMITH: Yeah, and your Honor, just --

THE COURT: You want to switch? Give me his. Give me his and you take yours back. That's fine.

MR. SMITH: And just to be clear --

THE COURT: I just want to all be looking at something.

MR. SMITH: We received this list from plaintiff's counsel on September 15th, your Honor, just to be precise.

THE COURT: Okay. Thank you. That's okay. So you get this list on September -- do you want to switch out?

MS. IZZO: No. I'm okay. Thank you, your Honor. Appreciate it.

THE COURT: So you get this list on September 15th. Okay. Now, let me ask counsel in the courtroom to

go on to what happens. You give this list to them and then what happens?

MS. IZZO: So then on September 22nd we receive an email from Alexander Smith, Hain's counsel, with the attached hit report and the hit report actually ascribes the documents with hits on the terms that you're looking at.

THE COURT: Okay.

MS. IZZO: So it goes term by term and it puts the number of hits for each.

THE COURT: Okay.

MS. IZZO: So presumably they had run it with their ESI vendor and gotten this report back --

THE COURT: And that's the number --

MS. IZZO: -- to confirm the universe of 480,000.

THE COURT: When you add that up, that's 480,000.

MS. IZZO: Correct.

THE COURT: Got it. And they send that to you and you're like okay, 480,000 it is. It's your position you agreed to these terms and counsel on the phone, that's not your position, right?

MR. SMITH: That is not our position, your Honor. That's correct.

THE COURT: Got it. Okay.

MS. IZZO: And just to be clear, your Honor, we weren't necessarily surprised by that size of documents. No doubt there's a lot of documents. But this is a nationwide class action so it impacts -- there's going to be either a nationwide class or state subclasses across the country. There's over 20 claims and it impacts over 18 -- sorry, over 15 plaintiffs.

So a case of this size, courts routinely find that having to review millions of documents is on par. So to end up with 480,000 as a universe seemed very reasonable to us. And we weren't inclined to ask for more up and above that.

And to that end, defense counsel today said the kind of appearance or position that plaintiffs had throughout this process was we're just trying to get a handle on what's out there, we're not really, you know, we don't have a deficiency or a specific category of documents to target. And that's really born out of the fact that this was the early stages of discovery, where we're negotiating search terms for the first time. We weren't in a position to identify deficiencies or missing documents in the production because in essence we hadn't really gotten the core production for the case yet.

THE COURT: Let me ask you this. You mentioned

that you -- do you have a chart that breaks down that 480,000?

MS. IZZO: Yes.

THE COURT: And it'll say, you know, arsenic gave us X number, things of that nature?

MS. IZZO: I do.

THE COURT: You do? I may ask --

MS. IZZO: Would you like me to approach the bench?

THE COURT: I may ask for a follow-up on all these questions. So all these questions I think are very relevant to the issue of proportionality. Right? Cases do have millions of documents and does it happen every day? No. But if it happens, that's okay as long as it's proportional to the needs of the case.

I think we all know what the scope of discovery is in this case. There's a lot of, you know, a lot of discovery, a lot of back and forth. But it's not that complicated, right?

So now I'm looking at that list. Counsel on the phone, let me ask you, you have this list too, right? You gave it to them?

MR. SMITH: Yeah. Yeah.

THE COURT: Okay. Well, this is my first time looking at it but I think this will be, this is going to

be interesting to me in coming to a ruling in this case.

Okay. So because I think the argument of the defense counsel is that you get into a point where what you're going -- the amount of work and money and effort that you're putting into something is going to get sort of, this is a vague way of saying it, diminishing returns. Not really mathematical, but it's saying we've looked at X number, spent whatever time and effort and money to do it. Were we to put in all of this extra time, you're not really getting much more.

So I guess let me ask counsel in the courtroom identify for me, you know, the search terms that are giving the most trouble or that you have the most difficulty with the other side?

MS. IZZO: So when you say difficulty, do you mean that we weren't able to reach agreement or that we view as most important?

THE COURT: Well, I mean you think you reached agreement.

MS. IZZO: Correct.

THE COURT: They think you didn't reach agreement. I'm going to go usually what that means is you didn't reach agreement which is funny because that happened this morning on another case but that's what's going on today. So I'm going to say there is not an

agreement, so I want to try to figure out points of contention. Let's put it that way.

MS. IZZO: Okay. So the greatest point of contention that we see, your Honor, are that there are key search strings missing from the list that you have in front of you now, things related to sales, profits, and data which are going to be key to any damages analysis.

THE COURT: That's damages, yes.

MS. IZZO: Also, terms that get to things like deviation and contamination. It's all well and good to search heavy metals or arsenic, but what's missing are the terms that are key to this case. There must be some deviation or change between the accepted levels whether they be accepted by federal standards or accepted by Hain's internal standards, and what was actually ending up in the food and in the finished product. So --

THE COURT: But do you get that information by testing on their product?

MS. IZZO: So this is a false advertising. Because it's false advertising, it's more tied to the consumer would expect a certain level based on Hain's internal standards and the way it held its product out. So --

THE COURT: And what he knew.

MS. IZZO: And what he knew. Correct.

THE COURT: Right? And are those terms -- those terms are in the document that's in front of me?

MS. IZZO: Yes. And your Honor, I just want to offer to maybe assist the Court in --

THE COURT: Yes, please.

MS. IZZO: -- assessing this. I think something that might be helpful to you, because the letter briefing was meant as a preview of the arguments --

THE COURT: Yes, absolutely. Yes.

MS. IZZO: -- we would be happy to submit by tonight or even tomorrow a list of the search strings, the kind of list that you have in front of you, no hits next to it. Alongside that, an explanation of why that search string is necessary up and above Hain's proposed search terms. So what is the disconnect between the search terms that we view as necessary versus Hain's?

And then in addition to that, we could submit a better copy of the hit report.

THE COURT: I think that would be helpful. Let me hear from defense counsel on that.

MR. SMITH: Your Honor, I think that one --

THE COURT: Also let me give you an opportunity to sort of weigh in on what we've been talking about here.

MR. SMITH: Thank you, your Honor. So I think that some of these things that plaintiff's counsel has crafted these search terms to find are things that don't necessarily require search terms. I think field data is one good example. They're obviously entitled to data reflecting sort of retail sales, pricing of the products. They will need that for the damages calculation and we are happy to pull that. Typically we would do so by going to a syndicated data source like Circana or IRI putting in some sort of date parameters and pulling whatever data is available.

THE COURT: Let me ask you have you given them over any documents that would go to damages or we're talking about not damages discovery here?

MR. SMITH: We have not given them that document yet. That is the document that we would pull. It's sort of a discrete sort of we pull it out of a database for them.

THE COURT: Here's what I'd like. What I'd like to do for now, and I think in terms of moving discovery as quickly as possible, I'd like to focus on non-damages discovery just for this, just for the purposes of our discussion today because I think that's mostly what we've been talking about. So if we're talking about very nicely offering to put something

together for me, which I will not make you do tonight, but let's set aside the damages part. Let's talk about, you know, what came new and I'll let you go on.

MR. SMITH: Sure, your Honor. And I think that that's fine.

So there are many of these terms that, you know, are about, you know, FDA or European Union (indiscernible) within accept or approve or consent or (indiscernible), et cetera, and/or expect.

I think that, you know, this is, appears to be one of the search terms that's designed to get at deviation forms which I think is a fair subject of discovery. The search as crafted is I think far too broad to get at that and we would propose something narrower. But you know, we wanted to have a discussion about how to get that deviation form to the extent we've not already produced them. And I believe that we produced quite a number of the deviation forms both as part of the package of documents that we produced to the congressional subcommittee as well as documents we pulled out of our ESI search in this case. But if that --

THE COURT: When you say a deviation form, is that testing that you do on your product where it deviates from whatever standard?

MR. SMITH: That's basically right, your Honor.

So we have -- Hain Celestial has internal standards for the allowable level of heavy metal, heavy metals in its products. And if it wanted to use ingredients that exceeded those standards, Hain would have to prepare sort of what's called a deviation form --

THE COURT: Got it.

MR. SMITH: -- explaining the reason that that deviation was appropriate. And typically that would be because Hain Celestial has done a calculation and had concluded that given the number, the amount of, you know, that ingredient in the product that it would not ultimately cause the product to have an unsafe level of arsenic or some other heavy metal.

THE COURT: Okay.

MR. SMITH: Right. So that's a relevant issue in this case. It's one that we're happy to provide discovery on. But the terms that they've used to sort of get at that issue in our view are too broad.

THE COURT: I'm looking at those terms now, right? And that's where the string starts with deviate or diverge or depart?

MR. SMITH: Yes.

THE COURT: Okay. What's wrong with that?

MR. SMITH: So for instance, are you looking at the deviate or diverge -- so these ones are not limited

to -- they're not limited in the products at issue and they're not limited to heavy metals.

THE COURT: Okay.

MS. IZZO: Your Honor, if I may? I don't want to interrupt but --

THE COURT: Go ahead.

MS. IZZO: -- we were willing to limit to Earth's Best heavy metals and arsenic. We're not looking to, you know -- I think there's one thing we can all agree on. We're not looking to obtain junk related to our case. We want to get to the heart of the case as quickly as possible.

THE COURT: And you said heavy metal and, defense counsel, you said heavy metal too.

MR. SMITH: Sure. And again, our view is that heavy metals is not relevant to the claims but we think that heavy metals in some cases could be an appropriate search term because it encompassed documents relating to arsenic in the products.

THE COURT: Okay. All right. I'm glad to hear you say that. I think that's fine. I just wanted to be clear on that. That was not clear to me.

Okay. So we're looking at deviates, diverts, depart, differs, stray, or scrub. I mean not everything makes sense to me.

MS. IZZO: Your Honor, some of them are actually designed with an ESI vendor or expert to be like portions of a word --

THE COURT: Oh, okay.

MS. IZZO: -- to hit on words. So scrub actually might be an abbreviation.

THE COURT: What does scrub mean?

MS. IZZO: I'll check with our ESI -- our head of ESI to understand what scrub is actually looking to capture.

THE COURT: You all know that better than I do.

MS. IZZO: It goes with the deviate theme.

THE COURT: Right.

MS. IZZO: So usually the words at the start of the string are in plain English to go with the theme.

THE COURT: Right.

MS. IZZO: And your Honor, I just want to make one point quickly. Hain had every opportunity to come to us and talk to us about objections to particular search strings and I don't know, you know, we went through this back and forth and we got assurances that they were running a TAR review. To now hear them on the phone pick apart --

THE COURT: No, no, no. I think --

MS. IZZO: -- search strings is surprising.

THE COURT: I asked them to pick apart. And I think that what they were probably trying to do is say all right, if we do it this way, let's see what it comes up with. I mean is that right, counsel?

MR. SMITH: That's correct, your Honor.

THE COURT: Right. And then you do it that way and then you say the argument is that it's not proportional to the case and here we are. So what we have to do to decide this is get into the search terms, right? And the particular, you know, what they are going to yield and sort of a more fulsome argument on why the 480,000 becomes disproportionate because that's the argument. Right, counsel?

MR. SMITH: That's correct, your Honor.

THE COURT: Okay. So having said all that, I don't think I have enough to rule from the bench. On the other hand, I don't want to take forever because this case is 2021 and what are your deadlines? Let me ask counsel here.

MS. IZZO: Yes. So the case was filed in 2021 --

THE COURT: Right.

MS. IZZO: -- so obviously delay is a major concern for us.

THE COURT: Yes.

MS. IZZO: Discovery only opened one year ago, your Honor. There were some procedural stays that were in place on discovery so discovery has been ongoing for a year and it's set to close on March 2nd which is just a little under three months away.

THE COURT: Is that fact discovery or is that all discovery?

MS. IZZO: Fact discovery.

THE COURT: Okay. Good. What do you think fact discovery is looking like beyond documents? You're talking about taking depositions?

MS. IZZO: Absolutely.

THE COURT: How many?

MS. IZZO: Well, there are nine custodians in the case currently so while we haven't discussed a number on our internal team, it would be something to the tune of at least nine custodians.

THE COURT: What does the defendant think on discovery in terms of depositions?

MR. SMITH: So this is the first we've heard about depositions from plaintiff's counsel in this case.

THE COURT: This is or is not?

MR. SMITH: This is.

THE COURT: Okay.

MR. SMITH: This is. And we are actually

surprised to not hear about this earlier. I mean look, like we understand that the case has taken a long time. As Ms. Izzo notes, there's a lot that's happened procedurally and discovery hasn't really been commenced in earnest until about a year ago.

You know, obviously if they want to take depositions, we think that's appropriate. Whether they can, you know, depose nine people, you know, before March 1st, you know, after we get through the search terms and production issue might be a little unrealistic. And again, we can figure out if there needs to be an adjustment to the schedule to allow that or how we proceed. But this is the first time that we've been hearing about these depositions.

THE COURT: Let me ask in terms of the type of depositions we're talking about, I think you said custodial.

MS. IZZO: So it would be a 30(b)(6) deposition and then custodial depositions.

THE COURT: Describe the custodial ones to me.

MS. IZZO: So there are custodians who are quality control experts. I'm sorry, quality control employees. Marketing employees, and people who oversee the internal standards. Those are the types of categories we'd be targeting to ask questions and

deposition testimony to the documents and explain to us some of the highly technical deviation logs that we're receiving, explain to us decisions that were made in marketing.

For example, in marketing, Hain would have had to have conversations on how to position their product to parents, whether they wanted it to be an elevated product, a pure product. And while the emails and draft labels get to a piece of that, we'll never know what Hain knew when they were making those determinations without a deposition.

THE COURT: Wouldn't that be types of 30(b)(6) depositions?

MS. IZZO: Not necessarily because I think marketing employees who may have raised the red flag and said isn't this a little bit tough to say it's -- I'm not assuming --

THE COURT: No, I know.

MS. IZZO: Isn't it a little bit rich to say it's a pure product when our deviation logs are coming in so high? Someone might have something different than the company lying to us to say -- and I'm not envisioning taking, you know, duplicative depositions of the same group over and over again, but just to get the highlights and interpret the documents.

THE COURT: And is there any way depositions or any depositions could go forward with the documents that you have and maybe with leave to talk to somebody again?

MS. IZZO: That's a great question, your Honor, because I've spent a lot of sleepless nights thinking about this because I really do want to move the case forward quickly.

THE COURT: Right.

MS. IZZO: And the answer to your question is sure, we could certainly take a deposition tomorrow. Actually, Gloria, who's with me today, is very well prepared to do that. The problem is we now know that there's 480,000 documents that might be relevant to one of those depositions. So if we notice the deposition now with Hain sitting on those documents that we now know hit on the search terms that are relevant we actually are putting everybody at a disadvantage because we don't have to go back and say oh no, now here's all these documents from this custodian, we asked them already and we have to call them back. That would just be inefficient for everyone.

And to that end, Hain has said I think they had reviewed 100,000 documents and gotten 10,000 that were relevant. Even if you take that 10 percent rate, and I don't ascribe to that rate, but even if you were to do

that, that's almost 50,000 documents. Like it's not an insignificant number of documents. That would certainly change a deposition binder one way or the other.

THE COURT: Let me ask defense counsel. I guess you would agree with that.

MR. SMITH: So certainly I think that we should wrap up whatever remains of this document production if anything before taking depositions. Our suspicion is that it will not be close to 10% of the documents that are responsive. We think that we came up with a pretty, you know, a significantly narrower list of terms and got 10% responsiveness from that narrow list. This list is much broader and we suspect that the number of responsive documents coming out of this should be substantially less than 10%. But we'll concede it's not zero.

THE COURT: Right.

MR. SMITH: And we think that, you know, whatever is to come of this process should happen before we start with depositions.

THE COURT: Okay. I think I do need more information. I think you've both been very helpful. I'm going to keep your documents so --

MS. IZZO: And your Honor, if I can make a suggestion that might --

THE COURT: -- if that's okay with you.

THE COURT: What I'd like you to do is I would like briefing but very brief briefing. So I'm going to have -- since it's the plaintiff's motion, I'm going to let you do no more than ten pages on a brief. You can put in affidavits in that but I think the person who I really wanted to see affidavits from is going to be on the defense side. So defendant, I'm going to give you an opportunity, ten page brief, and I'm envisioning affidavits either of counsel or of your vendor explaining to me, you know, sort of in greater detail what we've discussed today in terms of 480,000, what it takes, and really putting some meat on the bones as to why it's disproportional.

I do hate to ask for further briefing but I do think that there's enough here where I don't think it would be fair if I were to rule from the bench on this. I just don't think I have enough in terms of looking at the search terms because at this point I will say this, there has not been an agreement on search terms. That's a finding so far. I think the defendant has produced a significant amount of documents. I think that there is an overlap and I think counsel properly talked about it as a Venn diagram between the MDL documents and what would be in the scope of discovery here.

And I understand, don't spend time trying to

explain to me the difference because that won't matter. I understand that those cases are different because of the difference in damages. But they're very much the same in terms of, you know, what's in the product.

So that's what I want you to limit it to. Let's not talk about damages discovery. Let's just talk about this piece because I think on damages discovery that's more of you're still in the meet and confer process. So continue talking about that.

So now let me ask the plaintiff how much time do you want? And don't make yourself stay up all night.

MS. IZZO: I think one week from today is very doable, your Honor.

THE COURT: Okay. And defense, want one week to respond to that? Or do you need more?

MR. SMITH: I'm just going to look at my calendar. The only issue is --

THE COURT: I mean look at the calendar. You tell me.

MR. SMITH: -- I'm going to be out of the country from --

THE COURT: You sure?

MR. SMITH: I'll be out of the country from the 16th to 19th. If we could have our response due on the 26th, that would be great. And if they want a little bit

more time for their briefs --

THE COURT: What do you need?

MR. SMITH: -- you know, that would be fine too. I just, you know --

THE COURT: No, no.

MR. SMITH: I would hate to have -- I'm not that person. You take what you need. I'll do my part to do this as quickly as possible.

So plaintiff, what did you want until? Did you want until the 15th or do you want -- that's before the holiday weekend. Do you want to get it done before then?

MS. IZZO: Yeah, we'll still keep the 15th, your Honor. Keep it moving.

THE COURT: You're the 15th and defendant you're the 26th.

MR. SMITH: Yep, we'll take that.

THE COURT: Okay. So it's ten page briefs and that's exclusive of any affidavits.

MS. IZZO: When you say inclusive of any affidavit --

MR. SMITH: Understood, your Honor.

THE COURT: Exclusive, exclusive.

MS. IZZO: Exclusive.

THE COURT: Exclusive.

MS. IZZO: Oh, thank you.

THE COURT: Yes, yes. So you can put in whatever affidavit you think is appropriate. The question for me is what's proportional to the needs of this case? Okay?

MS. IZZO: Understood.

THE COURT: Any questions?

MR. SMITH: Understood, your Honor.

THE COURT: Any questions in the courtroom?

MS. IZZO: No. Thank you, your Honor.

THE COURT: Okay. Any questions on the phone?

MR. SMITH: No, your Honor. Thank you.

THE COURT: Okay. This has been very helpful. I'm sorry you didn't get on the plane. But unlike usually --

MR. SMITH: It happens, your Honor.

THE COURT: -- we had a good connection. Usually I can't hear people, so I'm pleased. And thank you all for being here. Everybody's very helpful. I'll just need a little bit more information.

MR. SMITH: Thank you, your Honor.

THE COURT: All right. Thank you for your paperwork.

MS. IZZO: Thank you.

THE COURT: Thank you.

(Matter concluded)

**C E R T I F I C A T E**

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **21st** day of **January**, 2026.

Mary Greco

Transcriptions Plus II, Inc.